IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| | § | |
| **HDD ROTARY SALES, L.L.C.** | § | **Case No.  11-38053** |
| | § | **Chapter 11** |
| **DEBTOR** | § | |
| | § | |
| | § | |

**DEBTOR'S COMBINED PLAN OF
REORGANIZATION AND DISCLOSURE STATEMENT
(PROPOSED BY HDD ROTARY SALES, L.L.C.)**

**DEBTOR'S COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT HAS BEEN SET FOR A FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE PLAN OF REORGANIZATION ON DECEMBER 14, 2011, AT 9:30 A.M., IN COURTROOM 404, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002.  [THE DISCLOSURE PROVIDED IN THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT WAS CONDITIONALLY APPROVED BY THE COURT ON NOVEMBER 15, 2011.]  THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (the "Committee").**

On or about September 23, 2011 (the "Filing Date"), HDD Rotary Sales, L.L.C. ("Debtor" or "HDD") filed its voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Bankruptcy Court" or "Court").

If you are a Creditor or Interest Holder, you should read this Combined Disclosure Statement and Plan of Reorganization carefully.  The Debtor urges all holders of Claims in Impaired Classes receiving Ballots to accept the Plan of Reorganization proposed by the Debtor as contained herein**.**

This Combined Disclosure Statement and Plan of Reorganization (the "DS/Plan"), any amendments, supplements, and exhibits thereto, the accompanying Ballot form, if any, and the related materials delivered together herewith are being furnished by the Debtor to holders of

Impaired Claims and Impaired Interests pursuant to § 1125,[1] in connection with the solicitation by the Debtor of votes to accept or reject the Plan and the transactions as described herein.

This DS/Plan is designed to provide adequate information to enable holders of Claims against and Interests in the Debtor to make an informed decision whether to vote in favor of or against the Plan of Reorganization that the Debtor is proposing. All Creditors are encouraged to read this DS/Plan in its entirety before voting to accept or reject the Plan proposed by the Debtor. The projected financial information contained herein has not been the subject of an audit, unless otherwise stated.

All holders of Impaired Claims should read and consider carefully the matters described in the DS/Plan as a whole prior to voting on the Plan proposed by the Debtor. In making a decision to accept or reject the Plan, each Creditor must rely on its own examination of the Debtor as described in this DS/Plan, including the merits and risks involved. You are encouraged to seek the advice of qualified legal counsel with respect to the legal effect of any aspect of the DS/Plan. In addition, Confirmation and Consummation of the Plan are subject to conditions precedent that could lead to delays in Consummation of the Plan proposed by Debtor. There can be no assurance that each of these conditions precedent will be satisfied or waived or that the Plan proposed by the Debtor will be consummated. Even after the Effective Date, distributions under the Plan proposed by the Debtor may be subject to delay so that disputed claims can be resolved.

With the exception of historical information, future events and matters discussed herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially.

No party is authorized by the Debtor to give any information or make any representations with respect to the DS/Plan other than that which is contained herein. No representation or information concerning the Debtor, its business or the value of its properties has been authorized by the Debtor, other than as set forth herein. Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein should not be relied upon by any holders of Claims or Interests in voting on the Plan proposed by the Debtor.

This DS/Plan has been prepared in accordance with § 1125 and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtor should evaluate this DS/Plan only in light of the purpose for which it was prepared.

This DS/Plan has not been approved or disapproved by the Securities and Exchange Commission (the "Commission") or by any state securities commission or similar public,

---

[1]    All references to "§" reference the applicable section of the Bankruptcy Code.

governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this DS/Plan and the information contained herein shall not be construed as an admission or stipulation by any Entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

This DS/Plan shall not be construed to be providing any legal, business, financial or tax advice.  Each holder of a Claim or Interest should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan or the transactions contemplated thereby.

## INCORPORATION OF DOCUMENTS BY REFERENCE

This DS/Plan incorporates by reference certain documents relating to the Debtor that are not presented herein or delivered herewith.  The following documents have been filed in the Debtor's bankruptcy case and are incorporated by reference herein in their entirety, including all amendments thereto filed prior to the date set for confirmation: (a) the Debtor's Second Amended Schedules filed on November __, 2011 [ECF Document 94]; and Amended Statement of Financial Affairs ("SOFAs") [ECF Document __].  Documents and pleadings filed in this case are available at the following website: http://www.txsb.uscourts.gov/.

## TABLE OF CONTENTS                                      **Page**

I.     INTRODUCTION AND SUMMARY ................................................................. 5
       A. THE SOLICITATION. ............................................................................. 5
       B. DEBTOR'S HISTORY, ASSETS, LIABILITIES, LITIGATION AND MAJOR
          EVENTS. ................................................................................................. 6
          1.   Incorporation and Ownership ........................................................ 6
          2.   Management................................................................................... 6
          3.   Other Personnel............................................................................. 7
          4.   Products and Services .................................................................... 7
          5.   Proprietary Technologies ............................................................... 8
          6.   Assets of HDD as of the Filing Date ............................................ 14
          7.   Summary of Creditors and Debt as of Filing Date ....................... 15
          8.   Description and Analysis of Secured Claims as of Filing Date......... 16
          9.   Description and Analysis of Priority Claims as of Filing Date ......... 18
          10.  Selected Prepetition Financial Information ..................................... 21
          11.  Selected Prepetition Tax Information ............................................. 21
          12.  Prepetition Litigation ..................................................................... 21
          13.  Prepetition Deposits for Drill Pipe by Redneck, Brigham and Fidelity. ........... 24
          14.  Prepetition Transactions With Axon Downhole Tools, Inc. ............... 24
          15.  Prepetition Transactions With Tiger Trading, Inc. .......................... 26

16.   Events Leading to HDD's Bankruptcy Filing.................................... 27
C. TIMELINE OF POST-PETITION ORDERS AND ACTIVITIES ............................ 28
II.   DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME . 32
A. DEFINITIONS................................................................................. 32
B. RULES OF INTERPRETATION............................................................. 35
C. COMPUTATION OF TIME................................................................... 35
III.   BAR DATES AND TREATMENT FOR ADMINISTRATIVE CLAIMS .................... 35
IV.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS . 35
A. CLASS 1 - ADMINISTRATIVE CLAIMS – PROFESSIONAL FEE CLAIMS AND
U.S. TRUSTEE QUARTERLY FEES ........................................................ 36
B. CLASS 2 – ALL OTHER ADMINISTRATIVE CLAIMS........................................ 37
C. CLASS 3 – ALLOWED SECURED/PRIORITY CLAIM OF MONTGOMERY
COUNTY ..................................................................................... 37
D. CLASS 4 – ALLOWED SECURED CLAIM OF MIDSOUTH BANK, N.A. .......... 38
E. CLASS 5 - ALLOWED SECURED CLAIM OF POST OAK BANK ..................... 38
F. CLASS 6 - ALLOWED SECURED CLAIMS OF FORD MOTOR CREDIT .......... 38
G. CLASS 7 - ALLOWED SECURED CLAIM OF GYRODATA, INC. ..................... 38
H. CLASS 8 - ALLOWED SECURED CLAIM OF DOBROWSKI LLP. ................... 39
I.   CLASS 9 - ALLOWED SECURED CLAIM OF AXON .......................................... 39
J.   CLASS 10 - ALLOWED INTEREST OF BRIGHAM OIL AND GAS, LP. ........... 40
K. CLASS 11 - ALLOWED INTEREST OF TIGER TRADING, INC. ....................... 41
L.   CLASS 12 – ALLOWED PRIORITY CLAIM OF THE IRS ............................... 41
M. CLASS 13 – ALLOWED PRIORITY CLAIMS OF DEBTOR'S EMPLOYEES..... 41
N. CLASS 14 – ALLOWED UNSECURED CLAIMS OF NON-INSIDER
UNSECURED CREDITORS .................................................................. 41
O. CLASS 15 – ALLOWED UNSECURED CLAIMS OF INSIDER UNSECURED
CREDITORS .................................................................................. 42
P. CLASS 16 – ALLOWED INTERESTS OF MEMBERS OF DEBTOR. .................. 42
V.   MEANS FOR EXECUTION OF THE PLAN.................................................... 42
A. SALE OF DEBTOR'S ASSETS - BID PROCEDURES ........................................ 42
B. SALE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES......... 45
VI.   PLAN AGENT.................................................................................... 45
A. APPOINTMENT OF THE PLAN AGENT ................................................. 45
B. DISTRIBUTION OF SALES PROCEEDS BY THE PLAN AGENT ON THE
EFFECTIVE DATE............................................................................ 46
C. POWERS AND DUTIES OF THE PLAN AGENT.......................................... 46
D. RELEASE. .................................................................................... 47
E. MONITORING, AUDITING AND BONDING. ............................................ 47
F. AVAILABLE CASH. ........................................................................ 47
G. COMPENSATION OF PLAN AGENT AND COMPENSATION AND
RETENTION OF PROFESSIONALS. ....................................................... 47
H. RESIGNATION................................................................................ 47
I.   REPORTING DUTIES........................................................................ 48
J.   TERMINATION............................................................................... 48
K. PAYMENT OF POST-CONFIRMATION QUARTERLY FEES............................ 48

      L.  PROVISIONS GOVERNING DISTRIBUTION ....................................................... 48
      M. PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND
          CONTINGENT CLAIMS ................................................................................. 49
VII.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................ 50
      A.  ENTRY OF CONFIRMATION ORDER. .......................................................... 50
      B.  FINALITY OF CONFIRMATION ORDER; WAIVER .................................... 51
VIII. PRESERVATION OF RETAINED CLAIMS AND VESTING ..................................... 51
IX.    ACCEPTANCE OR REJECTION OF THE PLAN ...................................................... 52
X.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 52
XI.    MODIFICATIONS AND AMENDMENTS ................................................................ 53
XII.   RETENTION OF JURISDICTION ............................................................................ 53
XIII.  EFFECTS OF CONFIRMATION ............................................................................. 55
      A.  BINDING EFFECT. ........................................................................................ 55
      B.  MORATORIUM, INJUNCTION AND LIMITATION OF RECOURSE FOR
          PAYMENT. ..................................................................................................... 55
      C.  EXCULPATION AND LIMITATION OF LIABILITY. .................................. 55
XIV.  DISCHARGE ............................................................................................................. 56
XV.   MISCELLANEOUS PROVISIONS ........................................................................... 56
XVI.  FEASIBILITY ............................................................................................................ 56
XVII. CONFIRMATION OF THE PLAN ........................................................................... 57
      A.  VOTING PROCEDURES AND REQUIREMENTS .......................................... 57
      B.  ACCEPTANCE. ............................................................................................... 58
      C.  CONFIRMATION OF THE PLAN .................................................................. 59
      D.  THE BEST INTERESTS TEST. ....................................................................... 59
XVIII. DISCLAIMERS .......................................................................................................... 60
XIX.  CONCLUSION AND RECOMMENDATION ............................................................ 60
XX.   EXHIBITS TO PLAN AND DISCLOSURE STATEMENT ......................................... 61

# I.   INTRODUCTION AND SUMMARY

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this DS/Plan.

## A.   THE SOLICITATION.

On November 8, 2011, the Debtor filed this DS/Plan.  This DS/Plan is submitted by the Debtor to be used in connection with the solicitation of votes on Debtor's Plan.

Debtor has requested that the Bankruptcy Court hold a hearing on approval of this DS/Plan to determine whether this DS/Plan  contains "adequate information" in accordance with § 1125.  Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the [Plan proposed by the Debtor.]"   A hearing to consider the final

approval of the Disclosure Statement has been set for the 14th day of December 2011, at 9:30 a.m., in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas.  A hearing on confirmation of the Plan has been set for the 14th day of December 2011, at 9:30 a.m., in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas, at which time the Court will hold a hearing on approval of the disclosure provided and on confirmation of the Plan proposed by the Debtor (the "Confirmation Hearing").  Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel listed below to ensure receipt by them on or before 5:00 p.m., on December __, 2011.  Bankruptcy Rule 3007 governs the form of any such objection.

| | | |
|---|---|---|
| Leonard H. Simon, Esq. | Christopher Adams, Esq. | Bruce Ruzinsky, Esq |
| The Riviana Building | Okin Adams & Kilmer LLP | Jackson Walker LLP |
| 2777 Allen Parkway, Suite 800 | 1113 Vine Street, Suite 201 | 1401 McKinney, Ste 1900 |
| Houston, Texas 77019 | Houston, TX 77002 | Houston, TX 77010 |
| (713) 737-8207 (Direct) | 713-228-4100 | 713-752-4200 |
| (832) 202-2810 (Direct Fax) | 888-865-2118 (fax) | bruzinsky@jw.com |
| lsimon@pendergraftsimon.com | cadams@oakllp.com | ATTORNEY IN CHARGE FOR |
| ATTORNEY IN CHARGE FOR | PROPOSED ATTORNEY IN | REDNECK PIPE RENTALS, INC |
| DEBTOR | CHARGE FOR UNSECURED | |
| | CREDITORS' COMMITTEE | |

## B.    DEBTOR'S HISTORY, ASSETS, LIABILITIES, LITIGATION AND MAJOR EVENTS.

### 1.    Incorporation and Ownership

HDD Rotary Sales, L.L.C. ("HDD"), was founded on May 29, 2008, as a Texas Limited Liability Company.  Its founders were Gary Haub, Rex Inman, Bart Powell and Jay M. Miller.

On July 1, 2009, HDD entered into an agreement with Jay M. Miller to purchase his outstanding membership units.  Upon execution of the purchase agreement, HDD converted Mr. Miller's units into redeemed treasury units.  By Certificate of Amendment filed June 17, 2011, it was reported that Jay Miller was no longer a member or manager of HDD.

### 2.    Management

HDD's corporate offices are located at 3303 West Davis, Suite 100, Conroe, Texas 77304.  At inception, HDD had three managers, Gary Haub, Rex Inman and Bart Powell.  By Consent of Members in Lieu of Annual Meeting in January 2010, Haub, Inman and Powell were appointed managers of HDD, and by Consent of Managers in Lieu of Annual Meeting in January 2010, Haub was elected President/Treasurer, Inman was elected Vice President/Secretary, and Powell was elected Vice President.   By Consent of Members in Lieu of Annual Meeting in January 2011, Haub, Inman and Powell were appointed managers of HDD, and by Consent of Managers in Lieu of Annual Meeting in January 2011, Haub was elected President/Treasurer, Inman was elected Vice President/Secretary, and Powell was elected Vice President.   By Certificate of Amendment filed June 17, 2011, it was reported that Gary Haub was a manager

and President of HDD.

**3.      Other Personnel**

Engineering:

Cain Pacheco, Director of Engineering
Joseph Casarez, Product Engineer
Ian Chtay, Field Service Operations Manager

Quality Assurance:

Steve Lazrine, Quality Assurance Manager

Operations:

Mel Wilhelm, Operations Manager
Deanna Reynolds, Senior Accountant
Larry McElligott, Purchasing
Chad Burk, Order Processing

Sales:

Gary Haub, Oilfield
Chip Dahl, Director of Sales
Duane Abshire, Rocky Mountain Area - Manager
Jeff Miller, International Sales Manager
Eric Driskill, Inside Sales

Prior to bankruptcy, HDD had approximately 35 full-time employees.

**4.      Products and Services**

HDD's manufacturing facility is located on 21.6994 acres at 13019 Crockett Martin Road, Conroe, Texas 77306.  Its products and services generally include the following:

- Drill Pipe
- Drill Collars
- Drive Chucks
- Drill Bits
- Drilling Equipment
- Downhole Motors
- Subs
- Reamers

- Hole Openers
- Non-Mag Drill Collars
- Swivels
- Threaders
- Equipment Inspection and Testing

HDD began as a manufacturer, distributor and repair facility for horizontal directional drilling tools for mini, midi and maxi rig applications.  Later, it entered the traditional oilfield services tools business and began building out its portfolio of offerings as well as expanding beyond its horizontal directional drilling customer base.

HDD maintained an inventory of steel pipe that was capable of being applied to any rig, regardless of the size and scope of drilling project, and maintained a stock of pipe and fitting accessories, in its attempt to offer "just-in-time" services.

HDD's inventory included 1-inch to 7 5/8-inch outer diameter pipe, in standard and metric lengths.  HDD offered a variety of different thread designs that provided higher torque, increased safety and extended life for each customer's unique drilling requirements.  Pipe thread is a spiral ridge on the end of the pipe that enables sections of pipe to be joined together.  For male fittings, pipe thread appears on the outer diameter; female fittings have thread on the inner diameter, allowing the two joints to be connected.

HDD attempted to maintain a highly skilled and well-trained service staff, with experience in the construction, oil and gas and mining industries, so as to offer in-depth knowledge and expertise to customers in determining the capabilities needed for each drilling scenario.  HDD's staff attempted to provide to its customers technical support, insight, assistance and advice on a wide range of drilling issues and applications, including technical specifications, failure analysis, performance analysis, maintenance and pipe handling.

## 5.    Proprietary Technologies

On July 14, 2009, HDD filed an application with the United States Patent & Trademark Office (Application No. 12-502,722) to patent its proprietary thread design for drill pipe (the "Application").  The invention, entitled "Threaded Tool Joint Connection," was generally described as follows in the application:

A double shoulder threaded tool joint connection has: a pin with external threads formed between a pin external shoulder and a pin internal shoulder, the pin having a nose section between the internal shoulder and the external threads; and a box with internal threads formed between a box external shoulder and a box internal shoulder. Both the external threads and the internal threads have a thread taper between 0.666 inch per foot and 1.0 inch per foot, and have a stab flank angle and a load flank angle that are equal to about thirty-three degrees. In another feature of the invention, both the external threads and the internal threads have roots formed in a shape of a portion of a circle.

On January 1, 2011, the Application was published by the USPTO as a patent application pursuant to 37 CFR 1.211, et seq (Publication No. US-2011-0012347-A1).  The publication may be accessed through the USPTO's publicly available Searchable Databases on the internet at www.uspto.gov/patft/. The patent application is still pending at this time.

The Application was filed and prosecuted by Tim Headley, Law Offices of Tim Headley, 7941 Katy Freeway, Suite 506, Houston, TX 77024.  Mr. Headley has been recently engaged as special counsel to the DIP to represent the company as patent counsel with respect to the prosecution of this patent application.

This patent-pending technology, which HDD refers to as Performance Technology Plus Connection ("PTECH+"), is a new proprietary increased torque connection that was designed to outperform other dual shoulder connections in torsion, tension, and fatigue performance.  With its simplistic design approach, proprietary thread profile, and dual shoulder design, this new connection has the capability to reach increased torques while still maintaining a streamline geometric design.  The PTECH+'s enhanced critical cross-sectional areas and shoulder contact areas create a unique design that increases the mechanical properties of the connection over the competition.  The PTECH+ Connection also takes advantage of 135ksi specified material yield strength (SMYS) to further increase the performance of the connection design.  The PTECH+ thread form design allows for a large single root radius, which reduces peak stresses within the connection, reduces connections stiffness, and increases fatigue resistance.

### a.      Benefits of the PTECH+ Connector

- Designed for Performance
- Enhanced Torque Capacity
- Increased Connection Life
- Extended Fatigue Performance
- Reduced Connection Peak Stress
- Larger ID for Improved Hydraulics

Enhanced Torque Capacity.  The PTECH+ connection provides the capability to reach maximum torques while still maintaining a streamline geometric design.  Torque capacities average 65% - 80% greater than API connections of the same dimensions and 10% - 30% greater than most proprietary high torque connections of the same dimensions.

Extended Fatigue Performance.  The PTECH39+ shows an increase in fatigue resistance of approximately 2.7 times greater than API NC-38 and 1.9 times greater than NC-40, thus increasing the connection life. This is due to the Large Single root radius considerably reducing the peak stresses within the connection and the connections stiffness.

Reduced Connection Stiffness & Peak Stress.  A reduction in Tool Joint and Connection

Stiffness is shown in the tables below:

| Connection Type | Connection OD | Connection ID | Connection Stiffness About the CCS | Tool Joint Stiffness | Difference in Connection Stiffness | Difference in TJ Stiffness |
|---|---|---|---|---|---|---|
| | IN. | IN. | IN⁴ | IN⁴ | % | % |
| PTech39+ | 4.875 | 2.688 | 25.1 | 25.2 | | |
| NC-38 | 5.000 | 2.125 | 29.1 | 29.7 | 13.9% | 15.2% |
| NC-40 | 5.500 | 2.563 | 41.7 | 42.8 | 39.8% | 41.2% |

| Connection Type | Connection OD | Connection ID | Connection Stiffness About the CCS | Tool Joint Stiffness | Difference in Connection Stiffness | Difference in TJ Stiffness |
|---|---|---|---|---|---|---|
| | IN. | IN. | IN⁴ | IN⁴ | % | % |
| PTech55+ | 6.625 | 4.250 | 77.1 | 78.5 | | |
| 5-1/2 FH | 7.500 | 3.250 | 135.5 | 139.3 | 43.1% | 43.6% |
| PTech59+ | 7.125 | 4.250 | 108.4 | 110.5 | | |
| 5-1/2 FH | 7.500 | 3.250 | 146.0 | 149.8 | 25.8% | 26.3% |

b.      **Design Validation of the PTECH+ Connector**

The PTECH+ Connection design has gone through the following testing and design validations:

3D Finite Element Analysis of VME Stress Distribution.   The PTECH+ Connection Design Models were numerically analyzed using ANSYS® X64ed. V12.1 to show the stress in the connection in both minimum and maximum internal gap tolerances due to make-up torque.  A 3D FEA Method was used to evaluate an overall connection peak stress and SCF instead of the typical 2D axisymmetric models.

Torsion Failure.  The PTECH39+ Connection has undergone torsion to failure testing to verify the design's calculated torsional strength.  The connection was tested at both worst case internal shoulder gaps.  See the following graph.



As Tested Torques based on stress analysis of strain gage data.

Min Gap Ultimate Torque Limit:        42,158 Ft-lbs
Max Gap Ultimate Torque Limit:        41,521 Ft-lbs

The PTECH55+ Connection has undergone torsion to failure testing to verify the designs calculated torsional strength. The connection was tested at both worst case internal shoulder gaps.  See the following graph.



As Tested Torques based on stress analysis of strain gage data.

      Min Gap Ultimate Torque Limit:     85,168 Ft-lbs
      Max Gap Ultimate Torque Limit:    82,428 Ft-lbs

<u>Multiple Make and Break</u>.  One hundred (100) Make and Breaks were also performed on the PTECH39+ and accomplished without any galling on either the pin or box connection.   One hundred (100) Make and Breaks were also performed on the PTECH55+ and accomplished without any galling on either the pin or box connection.

<u>Comparative Fatigue Testing</u>.  The PTECH39+ Connection was tested under a bending load to determine the fatigue life of the connection; this was performed on a cantilever fatigue machine with a rotating chuck that recorded number of cycles or revolutions.  See the following graph.



PTECH39+

Average Cycles:              1,076,947
Average Bending Moment:   154,723 in-lbs

NC-40

Average Cycles:              556,631
Average Bending Moment:   141,648 in-lbs

**6.**      **Assets of HDD as of the Filing Date**

| Description | | Value |
|---|---|---|
| Real Property | Land, Bldg. & Improvements @ 13019 Crockett Martin Rd., Conroe, TX, consisting of 21.6994 acres as per appraisal dated June 6, 2011.[2] | $ 1,274,000 |
| Cash on Hand | Accounts & Certificate of Deposit @ Post Oak Bank – This CD is collateral for a $400,000 loan. | 400,000 |
| Deposits | with Landlord and Utility Providers | 10,000 |
| Other Deposits | This deposit was with Superior Drillpipe Manufacturing, Inc. ("Superior"), and was a loan from Axon Downhole Tools, Inc. ("Axon") The deposit has been utilized to complete a postpetition transaction with DrillTube. | 300,000 |
| Receivables | Net of Doubtful Accounts. [2] | 136,936 |
| Machinery, Fixtures, Equipment and Supplies | Equipment, R&D Equipment, Inspection Equipment, Shop Tools, etc. (BV $1,693,192). [2] | 1,100,574* |
| Vehicles | Ford Trucks (2), Utility Tractor, Mobile Home (BV $67,000).  These trucks are fully encumbered by the liens of Ford Motor Credit. | 43,550* |
| Inventory | General Inventory, Raw Materials, Subs / Crossovers, HDD Products, Work in Progress (BV $974,947). [2] | 633,715* |
| Office Equipment, Furnishings and | Located at corporate office & manufacturing facility (BV $108,923).[2] | 70,799* |

---

[2] These assets are encumbered by (a) a first lien in favor of Debtor's major prepetition bank lender, Midsouth Bank, N.A.; (b) a subordinate lien in favor of Debtor's DIP lender, Redneck Pipe Rentals, Inc., (c) the potential security interest in certain inventory that may be asserted by Axon Downhole Products, Inc, pursuant to its Security Agreement and UCC financing statement, and (d) other subordinate lienholders and/or interest holders pursuant to Agreed Order Granting Expedited Motion to Approve Use of Alleged Cash Collateral and Adequate Protection for Alleged Secured Creditor With Respect to Sale of Inventory in Ordinary Course entered by the Bankruptcy Court on October 21, 2011.  ECF Document 89.

| Description | | Value |
|---|---|---|
| Supplies | | |
| Computer Equipment and Software | (BV $72,393).[2] | 47,055* |
| Patents, copyrights and other intellectual property | PTECH+[2] | unknown** |
| Total | | $ 5,600,000+** |

        *Management places a current fair market value on these assets at 65% of the stated book value of these assets.

        **HDD owns the patent pending and trademark on the PTECH+ Connection technology, the value of which is unknown but significant.  The PTECH+ technology, along with all other assets of HDD, will be sold at auction through a competitive bidding process on December 13, 2011 pursuant to certain bidding procedures set forth in Article V-A, below.

**7.      Summary of Creditors and Debt as of Filing Date**

| Claim Type | | Amount | |
|---|---|---|---|
| Secured | | $ 3,652,337 | |
| Priority | | 324,126 | |
| Unsecured | | $9,369,999 | |
| TOTAL | | $13,346,462 | |

| Secured Creditors | Amount | Collateral |
|---|---|---|
| Midsouth Bank, NA | 2,356,136 | Real property, equipment, inventory, receivables, general intangibles |
| Post Oak Bank | 401,894 | CD |
| Axon Downwhole Tools, Inc. | 300,000 | Per ECF Document No. 89 |
| Ford Motor Credit | 42,924 | Ford Trucks (2) |

| Secured Creditors | Amount | Collateral |
|---|---:|---|
| Dobrowski, LLP | 44,000 | Judgment Lien |
| Gyrodata, Inc. | 167,383.39 | Judgment Lien |
| Advent, Inc. | $340,000 | |
| Total: | $3,652,337 | |

| Priority Creditors | Amount |
|---|---:|
| Internal Revenue Service | $199,927 |
| Pre-petition Salaries | 62,419 |
| Montgomery County | 61,779.32 |
| TOTAL: | $324,126 |

## 8.    Description and Analysis of Secured Claims as of Filing Date

### a.    Midsouth Bank, N.A.

On September 23, 2009, Debtor executed a promissory note in favor of Midsouth in the original principal amount of $1,000,000 (the "$1,000,000 Note"), which was renewed and extended on March 23, 2011.  As of the Filing Date, the $1,000,000 Note had a principal balance of $996,006.94 and accrued interest due in the amount of $11,675.33.  The per diem amount accruing thereafter was $186.75.

On October 15, 2009, Debtor executed a promissory note in favor of Midsouth in the original principal amount of $850,000 (the "$850,000 Note.  As of the Filing Date, the $850,000 Note had a principal balance of $557,696.30 and accrued interest due in the amount of $23,392.79.  The per diem amount accruing thereafter was $112.31.

On November 23, 2009, Debtor executed a promissory note in favor of Midsouth Bank, N.A. ("Midsouth") in the original principal amount of $700,000.00 (the "$700,000 Note"). Midsouth has a first lien deed of trust on the Debtor's Manufacturing Facility securing the $700,000 Note.  As of the Filing Date, the $700,000 Note had a principal balance of $594,141.54 and accrued interest due in the amount of $21,344.75.  The per diem amount accruing thereafter was $111.40.

On August __, 2011, Debtor executed a promissory note in favor of Midsouth Bank, N.A. ("Midsouth") in the original principal amount of $150,000.00 (the "$150,000 Note").  As of the Filing Date, the $150,000 Note had a principal balance of $149,953.33 and accrued interest due in the amount of $1,924.51.  The per diem amount accruing thereafter was $29.15.

Because of the "mother hubbard" clauses in the loan documents, to secure all four notes, Midsouth alleges that it has a first lien security interest on the Debtor's cash, inventory, receivables, furniture, fixtures, equipment and general intangibles (including the PTech Technology and all ownership and other rights under the Application) and a first lien deed of trust on Debtor's Manufacturing Facility.  Midsouth alleges that the claims of MidSouth are over-secured.  The indebtedness owed to Midsouth is recapitulated in the table below:

| Date of Original Note | Original Principal Amount | Accrued Interest as of Filing Date | Principal Balance as of Filing Date | P&I Balance as of Filing Date |
|---|---|---|---|---|
| 9/23/2009 | $1,000,000.00 | $11,675.33 | $996,006.94 | $1,007,682.27 |
| 10/15/2011 | $ 850,000.00 | $23,392.79 | $557,696.30 | $581,089.09 |
| 11/23/2009 | $ 700,000.00 | $21,344.75 | $594,141.54 | $615,486.29 |
| 7/19/2011 | $ 150,000.00 | $1,924.51 | $149,953.33 | $151,877.84 |
| TOTAL: | $2,700,000.00 | $58,337.38 | $2,297,798.11 | $2,356,135.49 |

**THE COMMITTEE RESERVES ITS RIGHTS TO INVESTIGATE AND CHALLENGE THE VALIDITY, PRIORITY AND EXTENT OF THE MIDSOUTH PREPETITION COLLATERAL, PROVIDED THAT ANY SUCH CHALLENGE SHALL BE FILED WITH THE COURT WITHIN THIRTY (30) DAYS AFTER ENTRY OF THE FINAL CASH COLLATERAL ORDER, WHICH ENTRY OCCURRED ON OCTOBER 27, 2011.**

b.     **Post Oak Bank**

On January 31, 2011, HDD executed a promissory note in favor of Post Oak Bank in Conroe, Texas, in the original principal amount of $400,000 (the "Post Oak Note").  The Post Oak Note was secured by a $400,000 certificate of deposit issued by Post Oak Bank on January 20, 2011 (the "Post Oak CD").  The value of the Post Oak CD as of September 30, 2011, was $401,489.05.  The Debtor has no equity in the Post Oak CD.

c.     **Dobrowsky LLP Abstract of Judgment**

Dobrowski LLP acted as trial counsel for HDD and Gary L. Haub in a case styled *BWFJ, Inc. v. HDD Rotary Sales, LLC, et al,* in the 55th Judicial District Court, Harris County, Texas, Cause No. 2009-29516.  On June 20, 2011, Dobrowski LLP filed suit against Haub and HDD claiming unpaid attorney fees, Cause No. 2011-36538, In the 270th Judicial District Court, Harris County, Texas.  On August 12, 2011, an Agreed Final Judgment was entered against Haub and HDD for $83,231.48.  On September 14, 2011, the Agreed Final Judgment was abstracted in Montgomery County, Texas, thereby creating a judgment lien on the Debtor's Manufacturing Facility.  Said abstract of judgment is a preference under 11 U.S.C. § 547, and the Debtor intends

to contest same.  Dobrowsky LLP has indicated that the balance due as of the Filing Date was approximately $44,000.00.

> **d.      Advent Abstract of Judgment**

An Agreed Final Judgment was entered against HDD and in favor of Advent on April 18, 2011, for $467,000 plus $20,000 in attorney fees, $20,000 in prejudgment interest, costs of court and post judgment interest at the rate of 5%.  On September 16, 2011, Advent and HDD entered into an Agreement as to Payment of Judgment whereby Advent agreed to accept from HDD and HDD agreed to pay, as a settlement the total sum of $340,000.  Advent has taken the position that HDD defrauded it when it entered into this Agreement as to Payment of Judgment because its management knew HDD was about to file for bankruptcy and failed to advise Advent of same during the negotiation process.  Advent abstracted its judgment in the Montgomery County Official Public Records on September 20, 2011, thereby creating a judgment lien on the Debtor's Manufacturing Facility.  Said abstract of judgment is a preference under 11 U.S.C. § 547, and the Debtor intends to contest same.  HDD denies these allegations.  Advent may also be subject to an avoidance action under 11 U.S.C. § 547 for approximately $80,000 in payments made within ninety days of the Filing Date.

> **e.      Gyrodata Inc. Abstract of Judgment.**

On May 2, 2011, Gyrodata  Inc. abstracted a judgment against HDD in  the amount  of $149,647.15 in the Official Public Records of Montgomery County, Texas.  This abstract appears to have been filed outside the 90 day preference period, and Debtor does not believe that such abstract is subject to avoidance.  Gyrodata has filed a proof of claim indicating that the amount due as of the Filing Date was $167,383.39.

> **f.      Ford Motor Credit Company.**

Debtor is the owner of a 2010 Ford F150 Trucks which is financed through Ford Motor Credit Company ("FMCC"), Serial No. IFTFWIEV5AFA51141.  There is now due and owing to FMCC a net balance of $22,191.15, and Debtor is in default for contract payments totaling $793.23.  According to the NADA Official Used Car Guide, FMCC estimates the Collateral has a retail value of $28,000.00.  Debtor is the owner of a second 2010 Ford F150 Truck which is financed through FMCC, Serial No. IFTFWIEV4AFB49240.  There is now due and owing to FMCC a net balance of $22,261.08, and Debtor is in default for contract payments totaling $793.82.  According to the NADA Official Used Car Guide, FMCC estimates the Collateral has a retail value of $32,025.00.  As to each of these vehicles, FMCC has filed a Motion for Relief From the Automatic Stay, one on October 25, 2011 and one on November 3, 2011.  ECF Documents 95 and 128.  Debtor intends to oppose the motions.

> **g.      Axon Downhole Tools, Inc.**

On or about June 23, 2011, Axon Downhole Tools, Inc. ("Axon") advanced $300,000 to the Debtor pursuant to a Convertible Promissory Note, Bridge Loan Agreement and Security

Agreement dated June 23, 2011 (the "Bridge Loan"). The $300,000 was paid directly to Superior Drillpipe Manufacturing, Inc. ("Superior") as a deposit against the manufacture of drill pipe for certain of the Debtor's customers using Debtor's P-Tech+ technology. Axon asserts that the Debtor promptly defaulted under the Bridge Loan in a number of respects. On September 20, 2011, Axon filed a financing statement with the Secretary of State of the State of Texas, covering certain pipe that was manufactured by Superior utilizing Debtor's P-Tech39 technology, and described as follows (the "Superior Drill Pipe"):

> Approximately 20,000 feet of 4 inch Internal External Upset 14.0 lbs per ft, grade S-135, rg. 2 drill pipe with P-Tech 39 connections (4-7/8" OD X 2-11/16" ID) 11" pin and 13-1/2" box tongs and hardbanding on box end.

The $300,000 was transferred from Axon to Superior as a deposit for the manufacture of certain drill pipe. Thereafter, prior to the filing, Axon also purchased certain drill pipe direct from Superior, paid for same directly to Superior, obtained a Bill of Sale for same, and took delivery of the drill pipe. Subsequently, after the filing, Drill Tube International, Inc. ("Drill Tube"), a customer of the Debtor, placed an order for drill pipe. On October 21, 2011, the Bankruptcy Court entered an Agreed Order Granting Expedited Motion to Approve Use of Alleged Cash Collateral and Adequate Protection for Alleged Secured Creditor With Respect to Sale of Inventory in Ordinary Course entered by the Bankruptcy Court on October 21, 2011. ECF Document 89. By this order, the Bankruptcy Court authorized the use of the $300,000 and the sale of the Superior Drill Pipe, and granted Axon and other interest holders a subordinate lien on the Debtor's assets, as follows:

> "Axon and Brigham shall be, and hereby are, granted a subordinate replacement automatically perfected security interest and lien on the Debtor's assets (tangible, intangible, real, personal and mixed), including, without limitation, all property identified in the Debtor's schedules, but specifically excluding Chapter 5 causes of action, and an administrative claim to the extent the replacement lien is inadequate (a) only to the same extent, validity, priority and amount of Axon's and/or Brigham's pre-petition lien and/or interests in the property subject to the Motion, (b) only to the extent the Brigham and/or Axon has a valid, perfected and unavoidable security interest or priority interest in the property, and (c) subordinated as described in paragraph 8, above."

Debtor has consummated the transaction with Drill Tube, the $300,000 has been applied towards the cost of manufacturing the Superior Drill Pipe, and the Superior Drill Pipe has been sold to Drill Tube. The foregoing is the Debtor's description of the transaction, and Axon may or may not agree with the position stated by the Debtor and reserves all of its rights and remedies.

On September 15, 2011, Axon gave written notice to the Debtor of its intention to convert "to a royalty free, non-exclusive license to the P-Tech Connection by exercising its option to convert a portion of Loan and Noted amount." Axon prepared and forwarded to

Debtor's management a Premium Connection License Agreement which was dated and signed by Axon and Mr. Haub, on behalf of the Debtor, on September 22, 2011.

**9.      Description and Analysis of Priority Claims as of Filing Date**

   a.      **IRS Payroll Taxes**.

From inception until April 29, 2011, HDD leased its employees from a series of companies, Prime Pay, Administaff and Tri-Net, who, as part of their duties, processed the payroll and paid payroll taxes for these employees.  From April 29, 2011, until the Filing Date, the HDD handled its payroll in-house, and incurred $199,927 in unpaid payroll taxes, which remain unpaid.  From the Filing Date forward, all payroll tax deposits have been made.

   b.      **Prepetition Payroll.**

As of the Filing Date, HDD owed its employees wages totaling $62,419, which are described in the schedule attached hereto as **Exhibit "1"**, part of which, approximately $_____, was paid by the members of HDD after the Filing Date.

   c.      **Ad Valorem Taxes.**

The County of Montgomery has filed a proof of claim for ad valorem taxes due regarding Debtor's Manufacturing Facility through 2011 in the amount of $61,779.32.

   c.      **Prepetition Unsecured Claims.**

Debtor has 93 unsecured creditors with claims totaling $9,709,999.  Of the unsecured claims, there are two insider claims in favor of two of HDD's members: Gary Haub in the amount of $184,923.24; and Bart Powell in the amount of $738,021.60.

**10.     Selected Prepetition Financial Information**

| | 12/31/2009[3] | 12/31/2010[4] | 9/23/2011[5] |
|---|---|---|---|
| **INCOME STATEMENT** | | | |
| Revenues | 16,741,057 | 11,012,123.49 | 9,145.871.46 |
| Cost of Sales | 15,177,367 | 11,348,140.34 | 7.892.552.96 |
| Gross Profit/Loss | 1,563,690 | -336,016.85 | 1.253.318.50 |
| Net Income/Loss | -2,395,583 | -3,990,313.86 | -1,458,729.53 |
| **BALANCE SHEET** | | | |
| Total Assets | 3,988,997 | 4,444,932.18 | 4,209,952.30 |
| Total Liabilities | 7,194,390 | 11,640,639.59 | 13.257.192.36 |
| Net Worth | -3,205,393 | -7,195,707.41 | -9,047,240.06 |

**11.     Selected Prepetition Tax Information**

| | 2008 1065[6] | 2009 1065[7] | 2010 1065[8] |
|---|---|---|---|
| Gross Receipts or Sales | 8,151,307 | 16,741,057 | 11,012,124 |
| Cost of Goods Sold | 7,082,987 | 14,463,098 | 10,429,555 |
| Gross Profit/Loss | 1,068,320 | 2,277,959 | 582,569 |
| Total Income (Loss) | 1,068,327 | 2,280,354 | 583,077 |
| Total Deductions | 1,285,335 | 4,775,585 | 5,158,109 |
| Ordinary Income (Loss) | -217,008 | -2,495,231 | -4,575,032 |

**12.     Prepetition Litigation**

    **a.     *Advent Inc. v. HDD Rotary Sales, LLC*, in the District Court of Harris County, Texas, 125th Judicial District, Cause No. 2010-45652.**

    An Agreed Final Judgment was entered against HDD and in favor of Advent on April 18, 2011, for $467,000 plus $20,000 in attorney fees, $20,000 in prejudgment interest, costs of court and post judgment interest at the rate of 5%.  On September 16, 2011, Advent and HDD entered into an Agreement as to Payment of Judgment whereby Advent agreed to accept from HDD and HDD agreed to pay, as a settlement the total sum of $340,000.  Advent has taken the position that HDD defrauded it when it entered into this Agreement as to Payment of Judgment because its management knew HDD was about to file for bankruptcy and failed to advise Advent of same during the negotiation process.  HDD denies these allegations.  Advent may also be subject to an

---

[3] Audited by Karlins & Ramey, CPA

[4] Unaudited and for the year then ended.

[5] Unaudited and for the year then ended.

[6] Prepared by Karlins & Ramey, CPA

[7] Prepared by Karlins & Ramey, CPA

[8] Prepared by Karlins & Ramey, CPA

avoidance action under 11 U.S.C. § 547 for approximately $80,000 in payments made within ninety days of the Filing Date.

        **b.**      ***Binion & Sims, P.C. v. HDD Rotary Sales, LLC,* in the District Court of Harris County, Texas, 215th Judicial District, Cause No. 2010-65849.**

       A Default Judgment was entered against HDD and in favor of Binion & Sims, PC on April 18, 2011, for $19.790.95 plus costs of court in the amount of $235.00 and post judgment interest at the rate of 5%. Debtor believes that this judgment has been paid in full.

        **c.**      ***BWFJ, Inc. v. HDD Rotary Sales, LLC, Gary L. Haub, GNR Sales, Inc., Steven Bart Powell and Sooner Sales, Inc.,* in the District Court of Harris County, Texas, 55th Judicial District, Cause No. 2009-29616.**

       This lawsuit was dismissed in its entirety on January 26, 2011.

        **d.**      ***Dobrowski LLP v. HDD Rotary Sales, LLC and Gary L. Haub, GNR Sales, Inc., Steven Bart Powell and Sooner Sales, Inc.,* in the District Court of Harris County, Texas, 270th Judicial District, Cause No. 2011-36538.**

       Dobrowski LLP acted as trial counsel for HDD and Gary L. Haub in a case styled *BWFJ, Inc. v. HDD Rotary Sales, LLC, et al,* in the 55th Judicial District Court, Harris County, Texas, Cause No. 2009-29516. On June 20, 2011, Dobrowski LLP filed suit against Haub and HDD claiming unpaid attorney fees, On August 12, 2011, an Agreed Final Judgment was entered against Haub and HDD for $83,231.48. On September 14, 2011, the Agreed Final Judgment was abstracted in Montgomery County, Texas, thereby creating a judgment lien on the Debtor's Manufacturing Facility. Debtor believes that said abstract of judgment is a preference under 11 U.S.C. § 547, and intends to contest same. Dobrowsky LLP has indicated that the balance due as of the Filing Date was approximately $44,000.00.

        **e.**      ***Gyrodata Incorporated, as Assignee of MUD Motor Enterprises, LLC v. HDD Rotary Sales, LLC.,* in the District Court of Harris County, Texas, 333rd Judicial District, Cause No. 2011-03384.**

       On May 2, 2011, Gyrodata Inc. abstracted a judgment against HDD in the amount of $149,647.15 in the Official Public Records of Montgomery County, Texas. This abstract appears to have been filed outside the 90 day preference period, and Debtor does not believe that such abstract is subject to avoidance. Gyrodata has filed a proof of claim indicating that the amount due as of the Filing Date was $167,383.39.

        **f.**      ***Inrock Drilling Systems, Inc. v. HDD Rotary Sales, LLC, Jay Miller, J.T. Miller, Inc., and Gary Haub.,* in the District Court of Harris County, Texas, 295th Judicial District, Cause No. 2009-81357.**

       Inrock filed a lawsuit claiming that the defendants breached their fiduciary duties as

employees of Inrock and that Gary Haub violated a written non-compete agreement. Haub and HDD settled and were nonsuited on June 23, 2010. HDD and Haub agreed to a settlement of $800,000, and signed a promissory note for said amount, calling for a down payment of $10,000 on December 31, 2010 followed by ninety-five monthly payments of $10,000 each on the last day of each calendar month beginning January 31, 2011. The promissory note bears interest at 5%. It is believed that payments/partial payments were made through September 2011, with a payment of $10,000 on June 30, 2011, and two payments of $5,000 each on September 1, 2011, all three of which may be avoidable preferences under 11 U.S.C. § 547.

**g.** ***Redneck Pipe Rental, Inc. v. HDD Rotary Sales, LLC, Gary Haub, Bart Powell and Rex Inman.,*** **in the District Court of Montgomery County, Texas, 9th Judicial District, Cause No. 11-06-06122.**

Redneck claims in this lawsuit that in January of 2011, it made inquiries as to the purchase of 100,000 feet of pipe, with connections and accessories from the Debtor. The Debtor represented to Redneck that (i) the Debtor had the capability to acquire and fully provide the specified pipe, accessories, and connections and provided Redneck with a proposed time line in which Redneck's pipe order could be processed, completed and available for delivery to Redneck's customers, and (ii) Redneck's tool joints and pipe would originate from and be manufactured by specific vendors. Purportedly relying on the representations of the Debtor, Redneck (a) entered into an agreement for the purchasing and the processing of the pipe, connections and accessories from the Debtor, and (b) proceeded to wire transfer $2,106,720.00 to Debtor's bank account on January 14, 2011. Redneck wired an additional $1,167,390.00 to Debtor's bank account on February 10, 2011 (TOTAL: $3,274,110.00). Redneck alleges that as per the agreement, the funds were to be used by the Debtor for the specific purpose of acquiring 100,000 feet of the specified pipe and connections. Despite specific and formal demand by Redneck, Debtor never delivered the pipe, nor did it return the $3,274,110 deposit. Redneck claims that in March of 2011, it learned that no pipe was scheduled for processing or delivery. Redneck claims that it eventually learned that its pipe had not even been ordered by the Debtor, and that the Debtor (pre-petition) accepted payment from several oilfield firms for millions of dollars, and failed to deliver the products that were ordered or to refund the deposits made.

**h.** ***WMCO Valve International Inc. v. HDD Rotary Sales, LLC.,*** **in the District Court of Ector County, Texas, 70th Judicial District, Cause No. A131655.**

WMCO filed suit on the 25th of May, 2011, requesting a judgment for $101,945.00. WMCO never served HDD's registered agent for service of process. WMCO then obtained a default judgment against HDD. On September 12, 2011, an order was entered setting a hearing on a turnover motion filed by WMCO for September 23, 2011. Said hearing was averted by the filing of Debtor's chapter 11 proceeding on the morning of September 23, 2011.

     **i.**     *Grant Pride Co, L.P. v. HDD Rotary Sales, LLC, et al.***; In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:09-cv-2721.**

     The suit was filed by Grant Pride Co., L.P. ("Grant") on August 24, 2009, against HDD and Superior and involved patented and trademarked technology for High Torque premium drill pipe connections manufactured and sold exclusively by Grant.  Grant alleged infringement of its U.S. Patent No. 5,908,212, and its "XT" trademark as applied to high torque threaded connections for drill pipe.  Grant also made an unfair competition claim founded upon an allegation that HDD falsely advertised the maximum torque capacity of HDD's "Max-T" threaded connections.  Grant, HDD, and Superior settled the suit to the mutual satisfaction of all parties.  HDD and Superior agreed to change the design of a product they previously marketed to insure that it would not violate either Grant's patents or trademarks. The specific terms of the settlement are confidential.  In view of the settlement agreement between Grant, HDD, and SDP, the court entered an order of dismissal of the lawsuit on August 26, 2010.  All consideration promised under the settlement has been exchanged and completed.

**13.**     **Prepetition Deposits for Drill Pipe by Redneck, Brigham and Fidelity.**

     The Debtor, on a prepetition basis accepted deposits against the manufacture and delivery of drill pipe from three customers, ***Redneck Pipe Rental, Inc., Fidelity Exploration & Production Co., and Brigham Oil & Gas, L.P.***  In all three cases, the customer's pipe was never delivered by the Debtor.  The following Table summarizes these transactions:

| PREPETITION DEPOSITS | |
|---|---|
| Redneck | $3,393,890.00 |
| Brigham | $1,381,086.80 |
| Fidelity | $   540,000.00 |
| TOTAL: | $5,314,976.80 |

     Debtor, through its Chief Restructuring Officer, Wayne Fuquay, continues to investigate the receipt and disposition of the funds deposited with the Debtor by these customers.

**14.**     **Prepetition Transactions With Axon Downhole Tools, Inc.**

     In June 2011, Axon was in the process of evaluating the potential acquisition of the Debtor's business.  On or about June 23, 2011, Axon advanced $300,000 to the Debtor pursuant to a Convertible Promissory Note ($2,050,000 potential advances subject to the terms of the Bridge Loan Agreement and assuming no default), Bridge Loan Agreement and Security Agreement with HDD all dated June 23, 2011.  The $300,000 advance was transferred from Axon to Superior as a deposit against future pipe manufactured by Superior for the HDD.

Meanwhile, Axon continued performing due diligence with respect to the potential acquisition of the Debtor's business.  Axon alleges that it discovered through its due diligence review numerous matters that it felt were not fully disclosed by Debtor's management, and refused to advance any further funds under Convertible Promissory Note and Bridge Loan Agreement. Axon alleges that the Debtor promptly defaulted under the Bridge Loan Agreement in numerour respects.

On September 20, 2011, Axon filed a financing statement with the Secretary of State of the State of Texas, covering certain pipe that was manufactured by Superior utilizing Debtor's P-Tech39 technology, and described as follows (the "Superior Drill Pipe"):

> Approximately 20,000 feet of 4 inch Internal External Upset 14.0 lbs per ft, grade S-135, rg. 2 drill pipe with P-Tech 39 connections (4-7/8" OD X 2-11/16" ID) 11" pin and 13-1/2" box tongs and hardbanding on box end.

Axon alleges that, as a result of the defaults and situation, it purchased one string of approximately 20,000 feet of drill pipe manufactured by Superior using Debtors P-Tech+ technology which Debtor was unable to pay for.  Axon paid the required consideration directly to Superior and received a Bill of Sale and possession of the pipe, all prior to the filing Date,  On September 15, 2011, Axon gave written notice to the Debtor of its intention to convert "to a royalty free, non-exclusive license to the P-Tech Connection by exercising its option to convert a portion of Loan and Noted amount."  Axon alleges that this conversion option was specifically provided in the various agreements, although the Debtor may dispute this. Axon prepared and forwarded to Debtor's management a Premium Connection License Agreement which was dated and signed by Axon and Mr. Haub, on behalf of the Debtor, on September 22, 2011.

Drill Tube International, Inc. ("Drill Tube") is a customer of the Debtor that placed an order for certain drill pipe to be manufactured by Superior.  On October 21, 2011, the Bankruptcy Court entered an Agreed Order Granting Expedited Motion to Approve Use of Alleged Cash Collateral and Adequate Protection for Alleged Secured Creditor With Respect to Sale of Inventory in Ordinary Course entered by the Bankruptcy Court on October 21, 2011. ECF Document 89.  By this order, the Bankruptcy Court authorized the use of the $300,000 and the sale of the pipe, and granted Axon and other interest holders a subordinate lien on the Debtor's assets, as follows:

> "Axon and Brigham shall be, and hereby are, granted a subordinate replacement automatically perfected security interest and lien on the Debtor's assets (tangible, intangible, real, personal and mixed), including, without limitation, all property identified in the Debtor's schedules, but specifically excluding Chapter 5 causes of action, and an administrative claim to the extent the replacement lien is inadequate (a) only to the same extent, validity, priority and amount of Axon's and/or Brigham's pre-petition lien and/or interests in the property subject to the Motion, (b) only to the extent the Axon Security Interest is valid, perfected and unavoidable security interest or priority interest in the property, and (c) subordinated as described in paragraph 8, above."

Debtor has consummated the transaction with Drill Tube, the $300,000 has been applied towards the cost of manufacturing the Superior Drill Pipe, and the Superior Drill Pipe has been sold to Drill Tube.

Debtor, through its Chief Restructuring Officer, Wayne Fuquay, continues to investigate the efficacy of and consideration received by the Debtor for the Premium Connection License Agreement executed by the Debtor and Axon on September 22, 2011, and the financing statement filed by Axon on September 20, 2011, which may be subject to avoidance under 11 U.S.C. §§ 547 and 548.  Axon disputes these claims.  Everyone reserves all of their respective rights, remedies and defenses.  Additionally, Axon does not adopt the statements made by the Debtor herein, and same should not be construed as any admission against the interest of Axon.

**15.     Prepetition Transactions With Tiger Trading, Inc.**

Tiger Trading, Inc. ("Tiger Trading") has filed an adversary proceeding in the United States Bankruptcy Court for the Southern District of Texas – Houston Division, Adversary 11-03566 (the "Tiger Adversary"), naming as defendants HDD and Cain Pacheco, an employee of HDD.  In the Tiger Adversary, Tiger Trading claims that an alleged agreement existed among HDD, Cain Pacheco, an engineer working for HDD, and Tiger Trading (the "Parties") to form a new entity (referred to by Tiger Trading as the "PTech+ Entity") in June of 2010 for the purpose of obtaining a patent, marketing, licensing, and supplying PTech+, and that once the new PTech+ Entity was formed, the patent would be assigned to the new PTech+ Entity.  Tiger Trading further alleges that Tiger Trading would own a 30% ownership interest, HDD would hold a 60% ownership interest, and Pacheco would hold a 10% ownership interest in the new PTech+ Entity.

The patent application actually submitted to the US Patent Office by Mr. Pacheco and HDD indicates that Pacheco was the inventor, and HDD was the sole assignee owning 100% interest in the PTech+ patent application and any patent to be issued.  If there was an agreement of the sort and nature described by Tiger Trading, Tiger Trading acknowledges by its failure to allege otherwise that such agreement was oral in nature, that the so-called PTech+ Entity was never organized, that the patent has never issued, and that no transfers of the sort alleged by Tiger Trading occurred prior to HDD filing its chapter 11 proceeding on September 23, 2011, or since.

The causes of action asserted by Tiger Trading are set forth in its Original Complaint For Specific Performance, Or, In The Alternative, Equitable Rescission And Declaratory Judgment Respecting Ownership Of The Ptech+ Technology And Patent (the "Tiger Complaint"), which can be found as ECF Document 1 in the Tiger Adversary.

Debtor's deadline to answer the Tiger Complaint is at least thirty days into the future; however, Debtor anticipates that it will seek to dismiss the Tiger Adversary on one or more of the following legal grounds under Bankruptcy Rule 7012:

1. Such agreement was oral in nature and subject to the defense of being barred by 35 U.S.C. § 261, a corollary to the statute of frauds that is part of the federal patent laws.

2. Tiger Trading must produce a written assignment evidencing its 30% interest in order to ultimately succeed on its ownership claim under federal law.  A patent is "a creature of federal statute" which can only be transferred and assigned according to the terms of the patent statutes (35 U.S.C. § 1 *et seq.*). *See* United *States v. Solomon,* 825 F.2d 1292, 1296 (9th Cir.1987). The rules governing assignment provide that patents shall be assignable in law *by an instrument in writing*. *See* 35 U.S.C. § 261 (emphasis added). "[T]he instrument of transfer must be unambiguous and show a clear and unmistakable intent to transfer the patent; it must express intention to transfer ownership." *Solomon,* 825 F.2d at 1296; *see also Kothmann & Kothmann, Inc. v. Trinity Indus., Inc.*, 287 F.Supp.2d 699, 711 (S.D. Tex. 2002) ("the party asserting that it 'obtained all substantial rights' in a patent from an assignment or transfer "must produce a written instrument documenting the transfer of proprietary rights in the patent").

3. Any claim of Tiger Trading for specific performance, as a matter of law, is avoidable under 11 U.S.C. § 544(a)(1).

Additionally, the Debtor and the Committee are investigating the facts surrounding the principal of Tiger Trading, Thorn Huffman, being a compensated manager and officer of the Debtor from November 2009 through at least March 2010, and a guarantor of the Midsouth Bank indebtedness.  The implication is that Mr. Huffman and his company, Tiger Trading, may have been insiders of the Debtor and fiduciaries at the time they were negotiating to have the Debtor's patent application transferred to a new entity free and clear of the Debtor's creditors' claims.  The Debtor has not only been in the zone of insolvency since inception, it has been insolvent from inception.  Therefore, under prevailing law, the officers and managers owed fiduciary duties directly to the creditors of the estate.  At a minimum this would be relevant in terms of Tiger Trading's lack of "clean hands" in connection with its assertion of the equitable remedy of specific performance.  Tiger Trading and Thorn Huffman deny such allegations.

**16.    Events Leading to HDD's Bankruptcy Filing.**

There are many reasons for the decline in HDD's business, but principal among them is mismanagement and timing.  HDD commenced its business just as the crash was occurring in 2008.  Also, HDD was besieged with litigation over its technology and non-competition agreements its principal officer, Gary Haub, had entered into with other employers before forming HDD in 2008.  Additionally, several creditors have alleged that Gary Haub and other members of Debtor's management conducted business in a dishonest and fraudulent manner.

Prior to the chapter 11 filing, Debtor had been negotiating for a sale of its business and substantially all of its assets to Axon.  On approximately September 20, 2011, Axon informed Debtor's management that, as a result of what it had learned while performing due diligence on

the acquisition, it would be impossible to complete such acquisition without the protection of an order of sale from a bankruptcy court selling the assets free and clear of liens, claims and encumbrances.

On or about September 22, 2011, Debtor's management engaged the law firm of Pendergraft & Simon and lead attorney, Leonard H. Simon, to represent the Debtor as bankruptcy counsel. On the eve of September 22, 2011, Debtor's litigation counsel informed Debtor's management and Mr. Simon that a hearing was scheduled for 9:00 a.m. on September 23, 2011, in an Ector County District Court, 70th Judicial District, in a case styled *WMCO Valve International Inc. v. HDD Rotary Sales, LLC.,* Cause No. A131655, where a default judgment had been entered against the Debtor for in excess of $100,000. The hearing was regarding a Motion for Turnover that had been filed by WMCO. Rather than risk the entry of an unfavorable order by the Ector County District Court, it was decided that a chapter 11 filing would be instituted early in the morning on the 23rd day of September 2011, to avoid the hearing.

## C.    TIMELINE OF POST-PETITION ORDERS AND ACTIVITIES

There are many reasons for the decline in HDD's business, but principal among them is mismanagement and timing. HDD commenced its business just as the crash was occurring in 2008. Also, HDD was besieged with litigation over its technology and non-competition agreements its principal officer, Gary Haub, had entered into with other employers before forming HDD in 2008.

Prior to the chapter 11 filing, Debtor had been negotiating for a sale of its business and substantially all of its assets to Axon. On approximately September 20, 2011, Axon informed Debtor's management that, as a result of what it had learned while performing due diligence on the acquisition, it would be impossible to complete such acquisition without the protection of an order of sale from a bankruptcy court selling the assets free and clear of liens, claims and encumbrances. Additionally, the filing was necessary because a judgment creditor had caused the Constable to lock the gates to the Debtor's premises, and threatened to do so again. A hearing on a turnover order, as described below, was also a cause of the Debtor's filing.

On or about September 22, 2011, Debtor's management engaged the law firm of Pendergraft & Simon and lead attorney, Leonard H. Simon, to represent the Debtor as bankruptcy counsel. On the eve of September 22, 2011, Debtor's litigation counsel informed Debtor's management and Mr. Simon that a hearing was scheduled for 9:00 a.m. on September 23, 2011, in an Ector County District Court, 70th Judicial District, in a case styled *WMCO Valve*

*International Inc. v. HDD Rotary Sales, LLC.,* Cause No. A131655, where a default judgment had been entered against the Debtor for in excess of $100,000. The hearing was regarding a Motion for Turnover that had been filed by WMCO. Rather than risk the entry of an unfavorable order by the Ector County District Court, it was decided that a chapter 11 filing would be instituted early in the morning on the 23rd day of September 2011, to avoid the hearing.

## C.    TIMELINE OF POST-PETITION ORDERS AND ACTIVITIES

On September 23, 2011 (the "Filing Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor continues in possession of its property and is operating its business as a debtor-in-possession pursuant to §§ 1107, 1108 ("DIP"). Shortly after the Filing Date, the Debtor entered into a Letter of Intent with Axon Tubular Products, Inc. and/or its Assigns.

On September 29, 2011, the Debtor filed its Expedited Second Motion to Approve (i) Letter of Intent and Purchaser Protection Provisions, (ii) Sale Procedure and Form of Notice, and (iii) Certain Bid Protections (the "Motion"). ECF Document 27. On September 30, 2011, the Court set the Motion for hearing on October 6, 2011, at 1:30 p.m. On October 6, 2011, the Debtor filed an Amended Expedited Second Motion to Approve (i) Letter of Intent and Purchaser Protection Provisions, (ii) Sale Procedure and Form of Notice, and (iii) Certain Bid Protections (the "Amended Motion"). ECF Document 45. The Court set the Amended Motion for hearing on October 6, 2011, at 1:30 p.m. At the hearing, two parties, Axon and Redneck, expressed interest in entering into a Letter of Intent with the Debtor that called for a sale of substantially all of the Debtor's assets through a public auction. Both before and at the hearing, Axon and Redneck engaged in a bidding contest. Over a period of six days, Axon and Redneck had engaged in bidding and counter-bidding that resulted in the Redneck offer increasing to $4,600,000, and Axon's offer increasing from $3,600,000 to $4,800,000. As of the filing of the Amended Motion, both the Axon and Redneck offers called for (a) certain buyer protection features, to wit: a "break up fee" or a "termination fee" equal to 5% of the purchase price, (b) DIP lending facilities in the amount of $400,000, with interest at 5%. At or immediately before the hearing, Redneck made one final offer, raising its offered purchase price to $5,200,000, and Axon raised its offered cash purchase price to $5,000,000 plus other consideration. During the hearing, Redneck made one final modification to its offer: it agreed to become the "Stalking Horse" bidder for a purchase price of $5,200,000, and agreed to waive the requirement for buyer protection provisions. The Court was not persuaded that the Axon offer should be accepted; therefore, the Court expressed the view that the debtor should accept the Redneck offer.

On September 30, 2011, the Court entered an Interim Order temporarily appointing Wayne Fuquay as Chief Restructuring Officer ("CRO") of Debtor, subject to review at a later hearing (ECF Document No. 40).

On October 6, 2011, the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors (the "Committee"). ECF Document No. 46. The members of the Committee are:

- Inrock Drilling Systems, Inc., Attn: James Parker, Chief Financial Officer, 6000 Brittmore Drive, Houston, TX 77041, (713) 690-5600, FAX (713) 466-6815 [james.parker@inrock.com];

- Merrick Systems, Inc., Attn: Alice Jackson, VP Finance & Accounting, 55 Waugh, suite 400, Houston, TX 77007, (713) 579-3400, FAX (713) 579-3499 [alice.jackson@merricksystems.com]; and

- Advent, Inc., Attn: Joann Salazar, VP, Support Services, 6605 Roxburgh Drive, Suite 100, Houston, TX 77041, (713) 462-8347 or (832) 860-2499 [jsalazar@adventfirm.com].

Subsequently, Redneck followed through on its agreement to become the DIP lender to the Debtor, and on October 7, 2011, the Court entered an order authorizing post-petition secured financing in an amount up to $400,000 (ECF Document No. 54) from Redneck. Redneck was given a perfected security interest on all assets (real and personal) with interest at 5%; payable in full by the earlier of March 6, 2012 or closing of a sale of any assets of the Debtor's estate that includes any of the Debtor's intellectual property. To date the Debtor has borrowed $100,000 from Redneck pursuant to the post-petition financing.

On October 7, 2011, the Court also entered an order authorizing Debtor to use cash collateral to fund continuing operations to finish off its back-log and wind down its affairs. Specifically, Debtor was authorized to use up to $139,651 in receivables plus $6,065.28 in cash over the next 30 days. Midsouth Bank, N.A. was granted replacement liens on a post-petition basis as adequate protection of its pre-petition liens and a first priority administrative claim. ECF Document No. 53.

The Committee met and on October 11, 2011, selected Okin Adams & Kilmer as counsel for the Committee, with lead counsel, Christopher Adams, and counsel for the Committee appeared at a status conference held on October 11, 2011, at 3:00 p.m. Counsel for the Committee requested and the Court granted the Committee additional time for the Committee counsel to familiarize himself with the case. The Court set a hearing for October 21, 2011, at 11:00 a.m. to consider approval of Redneck's Letter of Intent and the Bid Procedures that had been submitted with the Amended Motion.

On October 18, 2011, the Court entered orders (a) granting Debtor's application to employ Pendergraft & Simon, LLP as general bankruptcy counsel (ECF Document No. 77); and (b) granting Debtor's application to employ Tim Headley as Special Counsel to finish prosecuting Debtor's patent-pending of the PTECH+ technology (ECF Document No. 78). The Court also entered a final order granting Debtor's application to employ Wayne Fuquay as CRO. ECF Document No. 79.

On October 25, 2011, Debtor filed amended schedules (ECF Document No. 94).

On October 27, 2011, the Court entered an order granting Debtor's motion to shorten the bar date.  ECF Document No. 109.  By such Bar Date Order,

**NOTICE IS HEREBY GIVEN THAT THE COURT HAS ENTERED AN ORDER SETTING NOVEMBER 30, 2011, AS THE BAR DATE FOR FILING PROOFS OF CLAIM OR PROOFS OF INTEREST FOR ALL CREDITORS AND INTEREST HOLDERS REQUIRED TO FILE SAME IN HDD'S BANKRUPTCY CASE. FAILURE TO FILE A PROOF OF CLAIM OR INTEREST REQUIRED BY THE BANKRUPTCY CODE OR BANKRUPTCY RULES BY THE NOVEMBER 30, 2011, BAR DATE MAY RESULT IN YOUR CLAIM OR INTEREST IN THIS CHAPTER 11 PROCEEDING BEING <u>DISALLOWED</u>.  PLEASE FILE YOUR PROOFS OF CLAIM OR INTEREST THROUGH AN ATTORNEY ELECTRONICALLY, OR BY MAIL ADDRESSED TO: DAVID J. BRADLEY, CLERK OF COURT, P. O. BOX 61010, HOUSTON, TEXAS 77208.**

On October 27, 2011, the Court also entered an Agreed Final Order authorizing Debtor to use cash collateral.  ECF Document No. 111.

On October 27, 2011, the Court also entered an Order Approving (i) Redneck LOI and (ii) Bid Procedures.  ECF Document No. 110.  The Order, Redneck LOI and Bid Procedures are attached hereto as **<u>Exhibits "5", "6" & "7"</u>**.  Following is a timetable for upcoming events:

| HDD TIMETABLE | |
|---|---|
| 11-11-2011 | Asset Purchase Agreement ("APA") to be finalized and filed. |
| 11-15-2011 | The Court will conduct a hearing on preliminary approval of this Disclosure Statement at 10:30 a.m. in Courtroom 404. |
| 11-18-2011 | If the Disclosure Statement is approved, the Combined Plan / Disclosure Statement, 363 Motion, and Ballots will be served on all creditors and parties-in-interest by First Class US Mail, postage prepaid. |
| 12-08-2011 | Bids pursuant to the Bid Procedures for Debtor's assets will be due by 5:00 p.m. |
| 12-09-2011 | Debtor will file with the Court notice identifying Qualified Bidders with attached copies of bids. |

| | |
|---|---|
| 12-12-2011 | All Bids must be submitted by 5:00 p.m. per Bid Procedures. |
| 12-13-2011 | Auction will be held in Courtroom 404 at 3:00 p.m. |
| 12-14-2011 | The Court will conduct a hearing on the 363 Sale Motion and Plan Confirmation at 9:30 a.m.  The Court may approve the 363 sale separate and apart from confirmation of the Plan. |

## D.   POST-PETITION FINANCIAL RESULTS OF OPERATION

Debtor's Monthly Operating Report for the period September 23, 2011, through the end of October 2011, is attached hereto as **Exhibit "2"**.

# II.  DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

## A.   DEFINITIONS.

For purposes of this Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article.  Any term used in this Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

"Administrative Claim" or "Administrative Priority Claim" means a Claim that is entitled to priority under §§ 326, 327, 330, 503(b)(1) - (9), 506(c) or 1103 asserted in this case, which Claims are described and treated in Article IV-A of this DS/Plan.

"Administrative Claim Bar Date" means the date set by the Court by which Administrative Claims entitled to priority under §§ 326, 327, 330, 503(b), 506(c) or 1103 asserted in this case, including substantial contribution Claims, must be filed.  Debtor will request that the Court set the Administrative Claim Bar Date by separate order of the Court.

"Allowed Claim"  means a Claim or any portion thereof (i) that has been allowed by a Final Order, (ii) that either has been Scheduled as a liquidated, non-contingent, undisputed Claim in an amount greater than zero in the Debtor's Schedules, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules or order of the Bankruptcy Court, or is the subject of a timely filed proof of Claim as to which either no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code or by any order of the Bankruptcy Court, or

any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, or (iii) that is expressly allowed in a liquidated amount in the Plan; provided, however that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim as to which a timely request for payment has been made in accordance with this Plan (if such written request is required) or other Administrative Claim, in each case as to which (i) a timely objection has not been filed, or (ii) a timely objection is filed and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.

"Bankruptcy Estate" shall mean the estate created under § 541 upon the filing of the Bankruptcy Case.

"Bankruptcy Rules" mean, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

"Claim" means a claim against any of the Debtor's Bankruptcy Estate, whether or not asserted, as defined in § 101(5).

"Class" means a category of holders of Claims or Interests, as described in Article IV below.

"Confirmation" means entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

"Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"Confirmation Hearing" means the date set by the Court for a hearing to confirm Debtor's Plan, which has been set for the 14th day of December 2011, at 9:30 a.m. in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan.

"DIP" means the Debtor-in-Possession that continues in possession of its property and is operating its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107, 1108.

"DS/Plan" shall mean this Combined Disclosure Statement and Plan of Reorganization dated as of November 15, 2011.

"Effective Date" means the date when the Confirmation Order becomes a Final Order.

"Filing Date" means September 23, 2011, the date when the Debtor filed this Chapter 11 proceeding.

"Final Order"  means an order or judgment of the Bankruptcy Court, as entered on the docket in the Debtor's Bankruptcy Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

"Impaired"  means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of § 1124.

"IRS" means the Internal Revenue Service.

"Other Distributable Proceeds" shall mean the proceeds of sale of all assets of the Debtor's bankruptcy estate that are not defined as Sale Assets, including but not limited to proceeds derived from the prosecution of all claims under Chapter 5 of the Bankruptcy Code, all litigation claims, whether such causes of action arise from contract, tort theories of liability, breach of fiduciary duty; member, manager or officer liability claims, insurance claims, statutory claims or other claims.

"Person" means an individual, corporation, partnership, governmental unit, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"Plan" means Articles II through XVII of this DS/Plan.

"Plan Documents" means any documents referenced in the Plan that are intended to be executed pursuant to the Confirmed Plan.

"Priority Claim" means a Claim asserted under § 507(a)(3-10) against the Debtor's Bankruptcy Estate.

"Retained Claims" shall mean any avoidance or preference claim under §§ 542-551 or other causes of action owned by the Debtor as of the Confirmation Date, including those listed on **Exhibit "3"**.

"Sale Assets" has the meaning ascribed to such term in Article V-A-1, infra.

"Sale Proceeds" shall mean the proceeds received by the Debtor from a sale of the Sale Assets.

"Secured Claim" means a Claim, other than a Setoff Claim, that is secured by an Encumbrance, or the proceeds of the sale of such property, in which the Debtor has an interest, to the extent of the value, as of the Effective Date or such later date as is established by the Bankruptcy Court, of such interest or Encumbrance as determined by a Final Order of the Bankruptcy Court pursuant to § 506 or as otherwise agreed upon in writing by Debtor and the holder of such Claim.

"Substantial Consummation" shall have the meaning given to that term in § 1101(2).  Substantial

Consummation shall occur on the Effective Date.

"Unimpaired Claim" means a Claim that is not an Impaired Claim.

 "Unsecured Claim" shall mean a Claim that is not a Secured Claim and that is not entitled to priority under § 507(a)(1-9), and  includes the deficiency portions of any Secured Claim.

"Voting Deadline" means December __, 2011, at 5:00 p.m., the deadline by which Ballots to accept or reject the Plan must be received by Debtor's counsel by in order to be counted.

## B.    RULES OF INTERPRETATION.

For purposes of this Combined Disclosure Statement and Plan, (a) any reference in this Combined Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference in this Combined Disclosure Statement and Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in this Combined Disclosure Statement and Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this Combined Disclosure Statement and Plan; (d) the words "herein" and "hereto" refer to this Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of this Combined Disclosure Statement and Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Combined Disclosure Statement and Plan; and (f) the rules of construction set forth in § 102 and in the Bankruptcy Rules shall apply.

## C.    COMPUTATION OF TIME.

All times referenced in this Disclosure Statement and Plan are prevailing Central Time. In computing any period of time prescribed or allowed by this Combined Disclosure Statement and Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

### III.  BAR DATES AND TREATMENT FOR ADMINISTRATIVE CLAIMS

With respect to all requests for payment of professional fees pursuant to §§ 327, 328, 330, 331, 503(b), 506(c) or 1103 for services rendered and expenses incurred prior to the Effective Date, such professionals shall file and serve an application for final allowance of compensation and reimbursement of expenses no later than 30 days after the entry of the Confirmation Order.

## IV.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

All Claims and Interests are placed in the Classes set forth below.  A Claim or Interest is

placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled.

## A.  CLASS 1 - ADMINISTRATIVE CLAIMS – PROFESSIONAL FEE CLAIMS AND U.S. TRUSTEE QUARTERLY FEES

**Description.**  All Claims entitled to administrative priority under §§ 330(a)(1), 503(b)(2) incurred during the Debtor Bankruptcy Case and U.S. Trustee Quarterly Fees Assessed Pursuant to 28 U.S.C. § 1930(a)(6).  A summary of the claims in Class 1 are as follows:

| Claimant | Estimated Fees and Expenses Through October 31, 2011 |
|---|---|
| United States Trustee | Unknown |
| Wayne Fuquay, CRO | |
| Pendergraft & Simon, LLP, Counsel for the Debtor | |
| Tim Headley, Special Patent Counsel | |
| Okin & Adams, Counsel for the Committee | |

**Treatment**.  The above Administrative Claims shall be paid in full out of the Sale Proceeds and/or Other Distributable Proceeds.  To the extent an Administrative Claim is allowed by the Court as of the Confirmation Date, it shall be paid by the Debtor in full out of the Sale Proceeds and/or Other Distributable Proceeds on the Effective Date.  To the extent an Administrative Claim is allowed after the Confirmation Date, the Debtor shall pay such claim on the date the order allowing such claim becomes a Final Order out of the Sale Proceeds and/or Other Distributable Proceeds.  The Debtor's Bankruptcy Estate shall be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to § 1930(a)(6).  Any fees due as of the date of confirmation of the Plan will be paid in full on the Effective Date of the Plan out of the proceeds from the sale of the Debtor's assets.  The Debtor also shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) out of the sale of the Debtor's assets until such time as the Bankruptcy Court enters a final decree closing this chapter 11 case, or enters an order either converting this case to a case under chapter 7 or dismissing this case.  After confirmation, the Debtor shall file with the Bankruptcy Court and shall transmit to the United States Trustee a true and correct statement of all disbursements made by the Debtor for each quarter, or portion thereof that this chapter 11 case remains open in a format prescribed by the United States Trustee.

Axon Tubular Products, Inc. has indicated that it may also submit an administrative claim for a substantial contribution in this case, however, the Debtor and Committee reserves their right to object to such claim.

**B.      CLASS 2 – ALL OTHER ADMINISTRATIVE CLAIMS.**

**Description**.  All Claims entitled to Administrative Priority under § 503(b)(2) other than Class 1 Administrative Claims.  Debtor shall request that the Court set an Administrative Claim Bar Date for the same day the Court sets the hearing on Confirmation of the Debtor's Plan.  The Order Setting the Administrative Claim Bar Date shall be disseminated to all creditors of the Debtor.  Only Administrative Claims that are timely filed by the Administrative Claim Bar Date shall be allowed in this class.

**Treatment**.  Allowed Administrative Claims in Class 2 shall be paid in full out the Sale Proceeds and/or Other Distributable Proceeds on the Effective Date, or as soon thereafter as such claims are allowed by Final Order.

**C.      CLASS 3 – ALLOWED SECURED/PRIORITY CLAIM OF MONTGOMERY COUNTY**

**Description**.   Class 3 consists of the Allowed Secured/Priority claim of Montgomery County for estimated 2011 Ad Valorem Taxes secured by a lien against HDD's Real and Personal Property.  Montgomery County filed a proof of claim on September 30, 2011 (POC No. 5).  The ad valorem taxes due on the HDD's Real and Personal Property are as follows:

| Tax Period | Account No. | Property | Estimated Tax |
|---|---|---|---|
| 2011 | 19.1022.32.69000 | INV / FURN / FIXT / EQUIP (13019 Crockett Martin Rd) | 54,875.41 |
| 2011 | 19.1001.82.69116 | INV / FURN / FIXT / EQUIP (3303 W Davis St) | 1,160.05 |
| 2011 | 00.0079.04.02601 | A0079 BEACH CLARK, TRACT 2 2.000 ACRES | 4,804.10 |
| 2011 | 00.0079.04.02600 | A0079 BEACH CLARK, TRACT 2 19.220 ACRES | 939.76 |
| **TOTAL:** | | | **61,779.32** |

**Treatment**.  The statutory amount due to Montgomery County, as of the date of payment, shall be paid in full out of the Sale Proceeds and/or Other Distributable Proceeds on the Effective Date.

**D.    CLASS 4 – ALLOWED SECURED CLAIM OF MIDSOUTH BANK, N.A.**

**Description**.  Class 4 consists of the Allowed Secured Claim of Midsouth Bank, N.A., as described in Section I.B.8.a., supra.

**Treatment**.  Midsouth Bank shall agree to a sale of the Sale Assets free and clear of all of its pre-petition and post-petition liens, claims and encumbrances, and MidSouth Bank's pre-petition and post-petition liens shall attach to the Sale Proceeds and/or Other Distributable Proceeds and Midsouth Bank's secured claim, as of the date of payment, shall be paid in full in preference to all other claims out of the Sale Proceeds and/or Other Distributable Proceeds on the Effective Date.  Upon receipt of payment in full of its Allowed Secured Claim, MidSouth shall execute a release of its liens and security interests on the Sale Assets, the Sale Proceeds and/or Other Distributable Proceeds, and all other assets of the Debtor.

**E.    CLASS 5 - ALLOWED SECURED CLAIM OF POST OAK BANK**

**Description**.  Class 5 consists of the Allowed Secured Claim of Post Oak Bank ("Post Oak"), as described in Section _____, supra.

**Treatment**.  Post Oak Bank's secured claim will be paid in full out of the proceeds of the certificate of deposit securing the loan.  To the extent that the claim of Post Oak is under-secured, Post Oak will have a general unsecured claim for such amount in Class 15, below.

**F.    CLASS 6 - ALLOWED SECURED CLAIMS OF FORD MOTOR CREDIT**

**Description**.  Class 6 consists of the Allowed Secured Claims of Ford Motor Credit ("FMC"), as described in Article I-B-8-e, at p17, supra.

**Treatment**.  FMC's secured claims will be paid in full out of the proceeds of the sale or disposition of the vehicles collateralizing its claim.

**G.    CLASS 7 - ALLOWED SECURED CLAIM OF GYRODATA, INC.**

**Description**.  Class 7 consists of the Allowed Secured Claim of Gyrodata, as described in Article I-B-8-e, at p18, supra.  .

**Treatment**.   The Sale Assets shall be sold free and clear of all liens, claims and encumbrances of Gyrodata, Gyrodata's Allowed Secured Claim will attach to the Sale Proceeds and/or Other Distributable Proceeds, Gyrodata will be paid in full out of the Sale

Proceeds and/or Other Distributable Proceeds on the Effective Date, and Gyrodate shall release its Abstract of Judgment Lien against the Debtor's Manufacturing Facility.

## H.   CLASS 8 - ALLOWED SECURED CLAIM OF DOBROWSKI LLP.

**Description**.   Class 8 consists of the Allowed Secured Claim of Dobrowski LLP, as described in Article I-B-8-c, at p17, supra.

**Treatment**.   Debtor believes that the Dobrowski LLP Abstract of Judgment is avoidable under 11 U.S.C. § 547.  If Dobrowski LLP does not agree to be treated as an Unsecured Creditor in Class 15, below, Debtor intends to file an adversary proceeding to contest the Dobrowski LLP Abstract of Judgment as being avoidable under 11 U.S.C. § 547.  Pending a resolution of such adversary proceeding by Final Order, Debtor shall deposit into the registry of the Court a sufficient amount from the Sale Proceeds and/or Other Distributable Proceeds to adequately protect Dobrowski LLC in the event its Claim is allowed as a Secured Claim by Final Order, such adequate protection amount to be determined by the Court.  On the Effective Date, Dobrowski LLC shall release its Abstract of Judgment Lien against the Debtor's Manufacturing Facility.

## I.   CLASS 9 - ALLOWED SECURED CLAIM OF ADVENT INC.

**Description**.   Class 9 consists of the Allowed Secured Claim of Advent, as described in Article I-B-8-d, at p17, supra.

**Treatment**.   Debtor believes that the Advent Judgment is avoidable under 11 U.S.C. § 547.  If Advent does not agree to be treated as an Unsecured Creditor in Class 15, below, Debtor intends to file an adversary proceeding to contest the Advent Abstract of Judgment as being avoidable under 11 U.S.C. § 547.  Pending a resolution of such adversary proceeding by Final Order, Debtor shall deposit into the registry of the Court a sufficient amount from the Sale Proceeds and/or Other Distributable Proceeds to adequately protect Advent in the event its Claim is allowed as a Secured Claim by Final Order, such adequate protection amount to be determined by the Court.  On the Effective Date, Advent shall release its Abstract of Judgment Lien against the Debtor's Manufacturing Facility.

## J.   CLASS 10 - ALLOWED SECURED CLAIM OF AXON

**Description**.   Class 10 consists of the Allowed Secured Claims of Axon, which is described in Article I-B-8-g, at p18, supra.

**Treatment**.   Debtor believes that the Axon security interest is avoidable under 11 U.S.C. §§ 547 and 548.  However, Axon disputes this.  If Axon does not agree to be treated as an Unsecured Creditor in Class 14, below, Debtor intends to file an adversary proceeding to contest the Axon security interest as being avoidable under 11 U.S.C. §§ 547 and 548. Pending a resolution of such adversary proceeding by Final Order, Debtor shall deposit into the registry of the Court a sufficient amount from the Sale Proceeds and/or Other

Distributable Proceeds to adequately protect Axon in the event its Claim is allowed by Final Order as a Secured Claim, such adequate protection amount to be determined by the Court.

## K.   CLASS 11 - ALLOWED INTEREST OF BRIGHAM OIL AND GAS, LP.

**Description**.  Class 11 consists of the Allowed interest of Brigham, which is described as follows:   Brigham Oil and Gas, LP ("Brigham") asserts that it ordered drill pipe which was paid for pre-petition given Debtor's representations that the drill pipe was ready for delivery.  However, 20,000 feet of the 40,000 feet of drill pipe ordered by Brigham was not delivered to Brigham. As such, Brigham claims a priority interest in the drill pipe that was manufactured by Superior and recently sold to Drill Tube, the Superior Drill Pipe. pursuant to the Agreed Order Granting Expedited Motion to Approve Use of  Alleged Cash Collateral and Adequate Protection for Alleged Secured Creditor With Respect to Sale of Inventory in Ordinary Course entered by the Court on October 21, 2011 (the "Agreed Adequate Protection Order").  ECF Document 89.  Brigham asserts this claim given the fact that the Debtor's property was used in the fabrication of the pipe and other resources of the Debtor may have been used to increase the value of the pipe as sold and the Debtor was paid in full for the P-Tech39 technology utilized to manufacture the pipe.  Brigham alleges that the Debtor's bankruptcy estate's alleged interest in the pipe was that the PTech process was used to modify the Drill Pipe and Brigham contends such rights belong to Brigham since Brigham paid for the threading.  Brigham further alleges the payment made in September 2011 is subject to a constructive trust and in order to proceed with such claim an adversary proceeding will have to be pursued by Brigham and/or a resolution agreed upon by the Debtor and approved by the Court.  Debtor disputes all of these allegations by Brigham at this time.   Pursuant to the Agreed Adequate Protection Order, the Court granted adequate protection to Brigham as follows:

> "Axon and Brigham shall be, and hereby are, granted a subordinate replacement automatically perfected security interest and lien on the Debtor's assets (tangible, intangible, real, personal and mixed), including, without limitation, all property identified in the Debtor's schedules, but specifically excluding Chapter 5 causes of action, and an administrative claim to the extent the replacement lien is inadequate (a) only to the same extent, validity, priority and amount of Axon's and/or Brigham's pre-petition lien and/or interests in the property subject to the Motion, (b) only to the extent the Brigham and/or Axon has a valid, perfected and unavoidable security interest or priority interest in the property, and (c) subordinated as described in paragraph 8, above."

**Treatment**.  Debtor believes that Brigham has only a Non-Insider Unsecured Claim against the Debtor, and that, beyond that, Brigham had no direct interest in or claim to the Superior Drill Pipe or to any assets of the Debtor.  If Brigham does not agree to be treated as a Non-Insider Unsecured Creditor in Class 14, below, Debtor intends to file an

adversary proceeding seeking to have the Court declare that Brigham's claims are that of a Non-Insider Unsecured Creditor.  Pending a resolution of such adversary proceeding by Final Order, Debtor shall deposit into the registry of the Court a sufficient amount from the Sale Proceeds and/or Other Distributable Proceeds to adequately protect Brigham in the event Brigham is determined, by Final Order, to have some claim against the Debtor's assets that is anything more than a Non-Insider Unsecured Claim, such adequate protection amount to be determined by the Court.

L.   **CLASS 12 - ALLOWED INTEREST OF TIGER TRADING, INC.**

**Description**.  Class 12 consists of the Allowed Interests of Tiger Trading, which is described in Article I-B-15, at p25, supra.

**Treatment**.  Debtor believes that Tiger Trading does not have a direct or indirect interest in or claim to any assets of the Debtor by virtue of the claims asserted in the Tiger Adversary.  However, pending a resolution of the Tiger Adversary by Final Order, Debtor shall deposit into the registry of the Court a sufficient amount from the Sale Proceeds and/or Other Distributable Proceeds to adequately protect Tiger Trading in the event Tiger Trading is determined, by Final Order, to have some claim against or interest in the Debtor's assets, such adequate protection amount to be determined by the Court.

M.   **CLASS 13 – ALLOWED PRIORITY CLAIM OF THE IRS**

**Description**. Class 13 consists of the Allowed Secured / Priority claim of the IRS.  The IRS holds a priority claim for withholding taxes in the amount of $199,927.06.  The IRS has not filed a proof of claim to date.

**Treatment**.  The statutory amount due to the IRS, as of the date of payment, shall be paid in full out of the Sale Proceeds and/or Other Distributable Proceeds, together with statutory interest, on the Effective Date.

N.   **CLASS 14 – ALLOWED PRIORITY CLAIMS OF DEBTOR'S EMPLOYEES**

**Description.** Class 14 consists of all Allowed Priority Claims of Debtor's employees, as set forth in Article I-B-9-b, at p19, supra.

**Treatment.**   The Allowed Claims of Creditors in this Class 14 shall be paid in full out of the Sale Proceeds and/or Other Distributable Proceeds on the Effective Date.

O.   **CLASS 15 – ALLOWED UNSECURED CLAIMS OF NON-INSIDER UNSECURED CREDITORS**

**Description**.  Class 15 consists of the Allowed Claims of Unsecured Creditors who are not insiders of the Debtor, and includes the deficiency portions of any of Secured Claims, if

any.  The claims of creditors in this class are set forth in the Schedule attached hereto as **Exhibit "4"**.

**Treatment.** The Allowed Claims of Non-Insider Unsecured Creditors in this Class 15 shall be satisfied, on a pro rata basis, from distribution of the Sale Proceeds and/or Other Distributable Proceeds available after the secured portion or priority interest of any Allowed Claims of Creditor in Classes 1 through 14 are satisfied in full.  Class 15 claimants will be entitled to interest as allowed by law and determined by the Court prior to any distribution to Creditors in Class 16 or Interest Holders in Class 17.

**P.    CLASS 16 – ALLOWED UNSECURED CLAIMS OF INSIDER UNSECURED CREDITORS**

**Description**.  Class 16 consists of the Allowed Claims of Unsecured Creditors who are insiders of the Debtor, and includes the allowed claims, if any, of the Debtor's members, Gary L. Haub, Rex W. Inman and Steven Bart Powell, and the Allowed Unsecured Claim of any other Creditor whose Claim is determined by the Court to be an Insider Unsecured Claim.

**Treatment.** The Allowed Claims of Insider Unsecured Creditors in this Class 16 shall be satisfied, on a pro rata basis, from distribution of the Sale Proceeds and/or Other Distributable Proceeds available after the Allowed Claims of Creditor in Classes 1 through 15 are satisfied in full, with interest as allowed by law and determined by the Court.

**Q.    CLASS 17 – ALLOWED INTERESTS OF MEMBERS OF DEBTOR.**

**Description**.  Class 17 consists of the Allowed Interests of the Debtor's members, Gary L. Haub, Rex W. Inman and Steven Bart Powell.

**Treatment.**  The Debtor's members shall each receive a pro rata distribution of the Sale Proceeds and/or Other Distributable Proceeds available for distribution after the Claims in Classes 1-16 are satisfied in full, with interest as allowed by law and determined by the Court.

**V.   MEANS FOR EXECUTION OF THE PLAN**

**A.    SALE OF DEBTOR'S ASSETS - BID PROCEDURES**

The Debtor's business and assets shall be liquidated and sold pursuant to the Bid Procedures approved by the Court, as follows:

1.    The Debtor has received a Letter of Intent or Term Sheet Agreement (the "LOI") with Redneck Pipe Rental's Inc. ("Redneck") (the "Lead Bidder"), a true and correct copy of which is attached hereto as **Exhibit "6"**, for the sale of the substantially all of the Debtor's assets, excluding cash, accounts receivable, notes receivable, prepaid assets and claims under Chapter 5 of the Bankruptcy Code, except for any Chapter 5 claims related to the license

agreement that Axon obtained from the Debtor and/or the Manufacturing Agreement obtained by Superior from the Debtor (collectively, the "Sale Assets""). The LOI also includes a release in favor of Redneck (just like the Axon offer included a release in favor of Axon). All initially capitalized terms used herein shall have the same meaning assigned in the LOI. The LOI contemplates that the Debtor and Lead Bidder will enter into an asset purchase agreement (the "APA"). These Bid Procedures shall govern the mode of conducting a sale of the Debtor's assets. The sale shall occur by Court Order pursuant to a duly filed Motion for Sale under 11 U.S.C. § 363 (the "Sale Motion") and/or confirmation of this Plan. Pursuant to the Order approving the LOI and these Bid Procedures (the "Order"), a true and correct copy of which is attached hereto as **Exhibit "5"**, the Debtor shall file the signed APA with the Court and make it available for review by creditors, bidders and parties in interest by the 11th day of November 2011, in accordance with the deadlines set in the Order. The LOI, and the procedures set forth below, have been approved by the Court.

2.     Debtor, the Lead Bidder, and the Committee shall conclude negotiations on, and finalize, a form of APA on or before November 11, 2011, 15 days after entry of the Court Order approving these Bid Procedures. That form of APA shall be filed by the Debtor via a Notice to the Court and, thereby, made available to all interested parties. Unless an objection to the form of the APA is filed by a party-in-interest within three (3) business days after submission, (as determined by reference to the ECF filing information sheet) all objections to the form of the APA will be deemed waived; however, notwithstanding the foregoing, a prospective bidder is allowed to submit its own form of asset purchase agreement black-lined against the APA. The form of APA submitted shall be deemed reasonable unless the Court finds that any material term(s) of the agreement create an unfair bidding advantage for the Lead Bidder, are manifestly unjust, or are such that the Court could not enter a sale Order under the standards of 11 U.S.C. § 363 for a sale of Debtor's Assets not in the ordinary course of business over the objection of creditors and stakeholders.

3.     Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must, on or before 5:00 p.m. Central Time on December 8, 2011, (i) execute and deliver to Debtor's counsel, Pendergraft & Simon, LLC, 2777 Allen Parkway, Suite 800, Houston, Texas 77019, Direct Line: (713) 737-8207, Direct Fax: (832) 202-2810, Email: lsimon@pendergraftsimon.com, a reasonable confidentiality agreement prepared by the Debtor, unless the bidder has already entered into a confidentiality agreement with the Debtor; (ii) deposit with Debtor's counsel the sum of $230,000.00 (each, the "Alternative Buyer's Deposit") which deposit shall be nonrefundable unless such Qualified Bidder is not the highest and best offer as determined by the Court, and shall be held in escrow, without interest, pending completion of the bid process; (iii) submit to Debtor's counsel an unqualified and binding cash bid totaling at least $5,450,000, along with an executed written binding agreement, black-lined against the APA executed by the Lead Bidder and the Debtor. Such bid shall not contain an inspection period nor be subject to any due diligence review, financing or other conditions/contingencies ("Qualified Bids"); and (iv) provide financial and other reasonable information, as may be requested to the Debtor's counsel, that allows the Debtor, through its Chief Restructuring Officer, Wayne Fuquay, and the Committee to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein. The Lead

Bidder is and shall be deemed to be, a Qualified Bidder, and does not need to take any further action to become a Qualified Bidder.  If no other Qualified Bidders are identified, the LOI and the to-be-executed APA between the Debtor and Redneck shall be deemed the Highest and Best Bid (as defined below).  No letter of intent or other written proposal submitted to the Debtor prior to the filing of these Bid Procedures by any party other than Redneck shall constitute or be considered a Qualified Bid for purposes of these Bid Procedures, unless it otherwise meets the requirements of a Qualified Bid under these Bid Procedures.   Redneck and each other Qualified Bidder shall be provided with copies of all non-attorney client, non-work product privileged documents concerning the subject of the Debtor's patent application.

4.     Debtor's counsel shall promptly provide to all prospective purchasers due diligence materials that will be selected by the Debtor and the Committee, and such other reasonable due diligence materials that a prospective purchaser may request, provided such prospective purchaser executes a reasonable confidentiality agreement.  Prospective purchasers may inspect the premises of the Debtor at a time that is set by the CRO.

5.     On or before 5:00 p.m. Central Time on December 9, 2011, the Debtor shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received.  This Notice shall also identify all Bidders who Debtor deemed to have submitted non-conforming bids or conforming bids submitted by non-qualified bidders.  The Debtor shall serve a copy of the notice and the corresponding bids on the Committee and all Qualified Bidders by electronic mail. Unless a party-in-interest files an objection with the Court before the close of business on the next day that the Court is open, all objections to the exclusion of bidders under these procedures shall be deemed waived and the bid process may continue without participation of the excluded bidders. On or before 5:00 p.m. Central Time on November 8, 2011, Debtor shall file a Sale Motion and/or a Plan providing for a sale of the Debtor's Assets, and shall use its best efforts to obtain approval of the sale as soon as possible.

6.     If two or more timely Qualified Bids (including the Lead Bidder's bid) are received, an auction for the Sale Assets will be conducted in Courtroom 404, The Bob Casey Federal Courthouse, 515 Rusk Street, Houston, Texas,  on **December 13, 2011, commencing at 3:00 O'Clock  p.m. Central Standard Time**.  Bankruptcy Judge David R. Jones shall conduct the auction, or, at the Bankruptcy Court's order, designate another person to conduct the auction. The auction shall be recorded via the Court's audio recording system. Only Qualified Bidders may participate in the auction. All Qualified Bidders, or their authorized representatives, must be physically present at the auction. At the commencement of the auction, the person conduction the auction shall announce the lead bid as of that time, and then open up to the floor to live bidding by Qualified Bidders. Minimum bid increments shall be $100,000. The person conducting the auction shall announce the highest bid thrice before striking off to announce a winning Bid.

7.     At the conclusion of the auction, whoever conducted the auction will announce the highest and best Qualified Bid (the "<u>Designated</u> <u>Highest and Best Bid</u>") and the next highest and best Qualified Bid (the "<u>Back-Up Bid</u>").  The Debtor (acting through the CRO) will seek approval of the Designated Highest and Best Bid at the final hearing on the Sale Motion and/or Plan confirmation hearing (as approved by the Court at the final sale hearing or Plan

confirmation hearing the "Confirmed Highest and Best Bid").  If, for any reason, the Qualified Bidder submitting the Confirmed Highest and Best Bid fails to timely consummate the purchase of the Sale Assets, the Debtor (acting through the CRO) may seek to consummate a sale based on the Back-Up Bid without further approval by the Court unless the Bidder submitting the Back-Up Bid requests a "comfort order" be obtained.  The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Sale Assets shall remain open and in full force until the close of a sale of the Sale Assets to the party making the Confirmed Highest and Best Bid or the party making the Back-Up Bid.

       8.     Within two business days after the conclusion of the auction described above, Debtor's counsel shall return by check or wire transfer the full amount of the Alternative Buyer's Deposit submitted by each party that is not selected as submitting the Confirmed Highest and Best Bid or the Back-Up Bid, and shall return the Purchaser's Deposit (as defined in the LOI) if Redneck is not the Confirmed Highest and Best Bid or the Back-Up Bid.  If the sale of the Sale Assets is consummated to the party submitting the Confirmed Highest and Best Bid, or is otherwise not consummated with the party submitting the Confirmed Highest and Best Bid within thirty (30) days after the conclusion of the auction, the Alternative Buyer's Deposit of the party that is declared to have submitted the Back-Up Bid or Purchaser's Deposit (as defined in the LOI), if applicable) shall be returned by check or wire transfer within two business days thereafter, unless the Alternative Buyer is required to close the sale as the Back-Up Bid.  In the event that any party that is required to close under these procedures fails to do so, that party's deposit is forfeited (with the provision that the forfeited deposit is not a limitation on damages).

## B.    SALE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES.

      The Assets shall be sold to the party who closes the transaction having made the Confirmed Highest and Best Bid or the Back-Up Bid, as the case may be, free and clear of liens, claims, encumbrances and interests of all of the Debtor's Creditors and parties-in-interest, including, but not limited to, those Creditors and/or owners of interests listed in Article IV, Classes 1-16, pp 32-37, supra, and all parties who have received notice of this DS/Plan and the pre and post-petition liens of MidSouth Bank, N.A. shall attach to the Sale Proceeds and/or Other Distributable Proceeds.  The authority for such a sale free and clear of liens, claims, encumbrances and interests can be found in 11 U.S.C. § 363(f & h), §1123(a)(5)(D) & §1123(b)(4).

## VI. PLAN AGENT

## A.    APPOINTMENT OF THE PLAN AGENT

      The Confirmation Order shall appoint as the Plan Agent a person or entity chosen by the Committee and approved by the Court, such appointment to be effective as of the Effective Date.

**B.      DISTRIBUTION OF SALES PROCEEDS BY THE PLAN AGENT ON THE EFFECTIVE DATE**

Out of the Sale Proceeds and/or Other Distributable Proceeds, the Plan Agent shall reserve $250,000 to cover the future fees and expenses of the Plan Agent and his attorneys. The Plan Agent shall distribute the remaining Sale Proceeds and/or Other Distributable Proceeds in accordance with the terms and provisions of Article IV of this Combined DS/Plan.

**C.      POWERS AND DUTIES OF THE PLAN AGENT.**

The Plan Agent shall be deemed to possess the same powers and duties as would a Chapter 11 Trustee consistent with Section 1123(b)(3)(B) of the Bankruptcy Code. The Confirmation Order shall empower and authorize the Plan Agent to take or cause to be taken all actions which in his judgment are necessary to secure the effective implementation of the Plan. The Plan Agent will receive all causes of action, rights, claims, and demands against any third parties, investors, individuals, or insiders that have not been released or assigned in accordance with the terms and provisions of this Plan that the Debtor owns or has an interest in or can assert in any fashion, whether pre-petition or post-petition under Section 544 through 550 of the Bankruptcy Code (the "Chapter 5 Claims"). The Confirmation Order shall also empower the Plan Agent to file claims objections as to all claims of Secured Creditors, Unsecured Creditors and Interest Holders under the Plan (the "Claims Objections"). The Plan Agent will be a representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute and defend, the Chapter 5 Claims and the Claims Objections. In that regard, the Plan Agent shall have the power and authority to perform the following acts:

1.   Distribute the remaining Sale Proceeds and/or Other Distributable Proceeds as specified in Article IV of the Combined DS/Plan;

2.   Deposit Sale Proceeds and/or Other Distributable Proceeds and draw checks and make disbursements thereof;

3.   Employ and have such attorneys, accountants, and clerical assistance as may be deemed necessary;

4.   Pay and discharge any costs, expenses, fees or obligations incurred by the Plan Agent as are necessary to pursue the Chapter 5 Claims and prosecute the Claims Objections as provided for herein;

5.   Take any action required or permitted by the Plan;

6.   Sue and be sued with respect to the Chapter 5 Claims and the Claims Objections;

7.   Settle, compromise or adjust by arbitration, mediation or otherwise, any Chapter 5 Claim or any of the Claims Objections;

8.   In general, without in any manner limiting any of the foregoing, take any action that would be lawful for any person having the duties and responsibilities described in this Plan, whether similar to or different from the ways above specified,.

## D.   RELEASE.

The Plan Agent will be released and indemnified for all obligations and liabilities of the Debtor, save and except those duties and obligations of the Plan Agent set forth in the Plan and those attributable to the gross negligence or willful misconduct of the Plan Agent.  Any Court approved sale to Redneck will include a release in favor of Redneck, and any court approved sale of Axon will include a release in favor of Axon.

## E.   MONITORING, AUDITING AND BONDING.

The Plan Agent will not be required to post bond or be audited or monitored except as otherwise expressly provided herein.

## F.   AVAILABLE CASH.

All funds collected by the Plan Agent and maintained pending distribution, shall be deposited with a bank approved by the Office of the United States Trustee as an approved entity for maintenance of debtor- in-possession bank accounts.

## G.   COMPENSATION OF PLAN AGENT AND COMPENSATION AND RETENTION OF PROFESSIONALS.

1.   The Plan Agent shall be entitled to receive compensation for services rendered based on an hourly rate to be set forth and approved in the Confirmation Order.

2.   The Plan Agent may retain agents and professionals. Unless provided for otherwise herein, the fees and costs incurred by the agents and professionals of the Plan Agent shall be paid quarterly, out of cash reserved for that purpose by the Plan Agent. Those agents and professionals retained by the Committee shall be deemed approved agents and professionals of the Plan Agent on the Effective Date.

## H.   RESIGNATION.

The Plan Agent may resign as such by an instrument in writing signed by the Plan Agent and filed with the Bankruptcy Court, provided that the Plan Agent will continue to serve as Plan Agent after his resignation until the time when appointment of his successor shall become effective.  Any creditor or interest holder has the right to petition the Bankruptcy Court to remove the Plan Agent for cause as outlined in section 324 of the Bankruptcy Code.  In the event of the death, resignation, incompetency, or removal of the Plan Agent, the Bankruptcy Court shall have the authority, upon order after a hearing with respect thereto, to appoint a successor Plan Agent.  Notice of such hearing shall be given to all creditors and parties in interest.  Such

notice may specify the date on which such appointment shall be effective. Every successor Plan Agent appointed shall execute, acknowledge and deliver to the Bankruptcy Court, the retiring Plan Agent, the Creditors and Interest Holders an instrument accepting such appointment, and thereupon such successor Plan Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers and duties of the retiring Plan Agent.

## I.   REPORTING DUTIES.

Forty-five (45) days after the end of each calendar quarter following confirmation, the Plan Agent will distribute to Creditors and Interest Holders an unaudited written report and account showing (i) the assets and liabilities at the end of such quarter or upon termination, (ii) any changes in the assets which have not been previously reported, and (iii) any material action taken by the Plan Agent in the performance of his or her duties under the under the Plan that has not been previously reported, and (iv) fees of professionals and the Plan Agent.

## J.   TERMINATION.

The Plan Agent shall continue to perform his duties until all Sale Proceeds and/or Other Distributable Proceeds have been fully distributed and all Chapter 5 Claims and Claims Objections have been fully adjudicated by Final Order. The Plan Agent shall pay all accrued but unpaid fees and expenses of the Plan Agent and his professionals, file a Motion to Close the Chapter 11 Case with the Bankruptcy Court, providing notice of same to the Creditors and Interest Holders, and distribute any remaining cash in the possession of the Plan Agent in accordance with the terms and provisions of Article IV of the this Combined DS/Plan. In the event any Chapter 5 Retain Claims litigation is still pending, the Reorganized Debtor shall be substituted in for the Plan Agent in each case, and the Reorganized Debtor shall have the right the same rights as the Plan Agent to litigate, settle or dispose of such litigation.

## K.   PAYMENT OF POST-CONFIRMATION QUARTERLY FEES.

The Plan Agent shall timely pay from the available cash all fees incurred pursuant to 28 U.S.C. §1930(a)(6) until the clerk of the Court closes the Chapter 11 Case. The Plan Agent shall file with the Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the cases remain open until the Clerk of the Court closes the Chapter 11 Case. The quarterly fees shall not be calculated based on the revenues and distributions by the Reorganized Debtor, but only such revenues and distributions of the Plan Agent.

## L.   PROVISIONS GOVERNING DISTRIBUTION

1.   **Distributions.**   Any payments or distributions to be made by the Plan Agent pursuant to the Plan shall be made to the holders of Allowed Claims in accordance with the terms and provisions of Article IV of this Combined DS/Plan.

2. **Means of Cash Payment.** Payments of Cash to be made by the Plan Agent pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

3. **Delivery of Distributions**. Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of Claim is filed); or if the Plan Agent has been notified of a change of address, at the address set forth in such notice. All Unclaimed Property shall revert to the available cash.

4. **Time Bar to Cash Payments.** Checks issued by the Plan Agent in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof. Requests for reissuance of any check shall be made directly to the Plan Agent by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Effective Date or ninety (90) days after the date of delivery of such check. After such date, all claims in respect of void checks shall be discharged and forever barred.

M. **PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS**

1. **Objection Deadline.** Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed no later than sixty (60) days after the Effective Date or twenty (20) days after a particular proof of Claim is filed, whichever is later. Any proof of Claim filed after the Bar Date or for Deficiency Claims or Rejection Claims, after the deadline for filing such claims set forth in this Plan shall be of no force and effect, shall be deemed disallowed, and will not require objection. All Contested Claims shall be litigated to Final Order, *provided, however*, that the Plan Agent may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court.

2. **Responsibility for Objecting to Claims.** All parties identified by the Bankruptcy Rules may file objections to Claims after the Effective Date of the Plan. The Plan does not impair the right of any party, including the Debtor, to object to any proof of claim.

3. **No Distribution Pending Allowance.** Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim. A reserve for the full amount of the Contested Claim shall be maintained until the Claim is decided.

4.   **Administration of Contested Claims.**

    (a) **Disputed Claims Reserve.** In determining the amount of distributions to be made under the Plan to holders of Allowed Claims, the appropriate distributions required by the Plan shall be made according to estimates and subject to the provisions of the Plan. To protect the interests of holders of Contested Claims, the Disputed Claims Reserve shall be established on the Effective Date.  The Plan Agent shall fund the Disputed Claims Reserve with Cash in an amount that represents the Pro Rata Share of the Cash that would otherwise be distributed to holders of Contested Claims if such Claims were Allowed.

    (b) **Distribution After Allowance.**  As soon as practicable after a Contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount equal to the aggregate of all the distributions that such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date.  Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs. The Plan Agent shall have the right to make or direct the making of all interim distributions to the holders of Allowed Claims. No interest shall be paid on account of a Contested Claim that later becomes an Allowed Claim.

    (c) **Distribution After Disallowance.**  If and when a Contested Claim becomes a Disallowed Claim, the Pro Rata Share of the distributions to which each holder is entitled shall increase commensurately. Accordingly, the Plan Agent, in his sole discretion, shall have the right to make or direct the making of any subsequent distributions.

## VII.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The occurrence of each of the following events shall be a separate condition to the Consummation Date.

## A.   ENTRY OF CONFIRMATION ORDER.

The Confirmation Order shall have been signed by the Court and duly entered on the Court's docket in form and substance acceptable to the Debtor, and shall include, among other things, findings of fact and/or conclusions of law that:

    1.  approve the terms of the Plan, as it may be amended or modified, and all other agreements contemplated by the Plan;

    2.  provide that, except as otherwise expressly provided in the Plan, all entities who have held, hold or may hold Claims against, or Interest in, the Debtor's Bankruptcy Estate  will be

permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or against the Debtor's Bankruptcy Estate  on account of any such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against Debtor or the Debtor's Bankruptcy Estate on account of any such Claim and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from Debtor or the Debtor's Bankruptcy Estate  on account of any such Claim; provided however, notwithstanding any provision of the Plan to the contrary, each holder of a Claim shall be entitled to enforce his, her or its rights under the Plan;

3.    reserve the jurisdiction of the Bankruptcy Court in accordance with Section XII, below;

4.    terminate the automatic stay under § 362; and

5.    provide, pursuant to § 1125(e), that persons who have solicited acceptances or rejections of the Plan have acted in good faith and in compliance with the provisions, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## B.    FINALITY OF CONFIRMATION ORDER; WAIVER.

The Confirmation Order, in form and substance satisfactory to Debtor shall either have become a Final Order, or such condition shall have been waived by the Debtor.

## VIII.   PRESERVATION OF RETAINED CLAIMS AND VESTING

*Vesting*.  The Bankruptcy Estate shall remain open after Confirmation of the Plan (a) to permit the Plan Agent to prosecute all avoidance actions and other lawsuits of the bankruptcy estate to final conclusion, (b) to permit the Plan Agent, Debtor or any other Creditor or party in interest to prosecute to conclusion all claims objections, (c) to permit the Plan Agent to liquidate the assets not sold pursuant to the Bid Procedures and the LOI, and (d) and to make final distributions to all creditors as provided for in this Plan, including the U.S. Trustee fees through the closing of the case.

*Retention and Enforcement of Causes of Action*.   Except as otherwise provided in the Plan, all causes of action that the Debtor and its estates may hold against any Person or entity shall be retained by the Estate of the Debtor and shall be prosecuted by the Plan Agent, after the Effective Date.  A list of such claims that shall be pursued is attached hereto as **Exhibit "3"**. Any creditor that is subject to an avoidance action may have an unsecured claim if and to the extent any transfer is returned to the Debtor's estate.

***Settlement of Retained Claims and Objections to Claims***.   After the Confirmation Date, the Plan Agent shall be authorized to settle and compromise any and all Retained Claims and any

objections to Claims by filing a notice of settlement with the Bankruptcy Court and the applicable settlement entered into between the Plan Agent and a defendant or holder of a claim (a "Settlement Notice").  The Debtor shall serve a copy of the Settlement Notice on the twenty largest Unsecured Creditors and any parties requesting notice in the Debtor's Bankruptcy case by email.  If no party files an objection to the Settlement Notice within 10 days after the Settlement Notice is filed, the proposed settlement shall be deemed approved without further order of the Court.  If an objection to the Settlement Notice is timely filed, the Debtor shall file a motion for approval of the Settlement pursuant to Bankruptcy Rule 9019 and seek court approval of the Settlement.

## IX.   ACCEPTANCE OR REJECTION OF THE PLAN

*Classes Entitled to Vote.*  Each Impaired Class of Claims or Interests that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan. Ballots shall be cast and tabulated with respect to Claims against and Interests in the Debtor's Bankruptcy Estate.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.  Classes _____ are impaired  and are entitled to vote.

*Acceptance or Rejection by Impaired Classes.* An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under § 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan; and (ii) the holders (other than any holder designated under § 1126(e)) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  A Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Interests of such Class do not entitle the holders of Claims or Interests in such Class to receive or retain any property under the Plan on account of such Claim or Interest.

*Cramdown.*  The Debtor will request Confirmation of the Plan, as it may be modified from time to time, under § 1129(b) ("Cramdown").

## X.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Under § 365, the Debtor has the right, subject to Bankruptcy Court approval, to assume or reject any executory contracts or unexpired leases. If the Debtor rejects an executory contract or unexpired lease that was entered into before the Filing Date, it will be treated as if it had been breached on the date immediately preceding the Filing Date, and the other party to the agreement may assert a General Unsecured Claim in Class 15 for damages incurred as a result of the rejection. In the case of rejection of employment agreements and real property leases, damages are subject to certain limitations imposed by §§ and 502.  Debtor is unaware of any contracts that need to be rejected.

The Plan constitutes a motion to reject any executory contracts to which the Debtor is a party listed on Amended Bankruptcy Schedule H.  If the rejection by the Debtor pursuant to the Plan or otherwise of an executory contract or unexpired lease results in a Claim that is not

theretofore evidenced by a timely proof of Claim or a proof of Claim that is deemed to be filed timely under applicable law, then such Claim will be forever barred and unenforceable against the Debtor's Bankruptcy Estate, unless a proof of Claim is filed with the clerk of the Court and served on counsel for the Debtor within thirty (30) days after entry the Confirmation Order.

Furthermore, any licensee of intellectual property shall retain all of its rights even if the agreement is rejected as provided in Section 365 of the Bankruptcy Code, unless such license is otherwise avoidable in bankruptcy or subject to being set aside under non-bankruptcy law.

## XI.  MODIFICATIONS AND AMENDMENTS

The Debtor may alter, amend, or modify the Plan or any Exhibits thereto under § 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to the earlier of (i) the Consummation Date; or (ii) Substantial Consummation of the Plan, the Debtor may, under § 1127(b) , institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Equity Interests under the Plan; provided, however that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## XII.   RETENTION OF JURISDICTION

Under §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and passage of the Consummation Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim or Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interest;

B.    Hear and determine all applications for compensation and reimbursement of expenses of Administrative Claims or Priority Claims;

C.    Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

D.    Effectuate performance of and payments under the provisions of the Plan;

E.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

F.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

G.     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

H.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

I.     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

J.     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

K.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtor's Bankruptcy Case;

L.     Hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

M.     Hear and determine all matters related to the property of the Debtor's Bankruptcy Estate from and after the Consummation Date;

N.     Hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

O.     Enter a final decree closing the Debtor's Bankruptcy Case.

## XIII.   EFFECTS OF CONFIRMATION

### A.    BINDING EFFECT.

The Plan shall be binding upon all present and former holders of Claims and Interests and their respective successors and assigns.

### B.    MORATORIUM, INJUNCTION AND LIMITATION OF RECOURSE FOR PAYMENT.

Except as otherwise expressly provided in the Plan, all entities who have held, hold or may hold Claims against, or Interest in, the Debtor's Bankruptcy Estate or the Debtor will be permanently enjoined, on and after the Consummation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (ii), the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or the Debtor's Bankruptcy Estate, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or the Debtor's Bankruptcy Estate on account of any such Claim and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or the Debtor's Bankruptcy Estate on account of any such Claim; provided, however, notwithstanding any provision of the Plan to the contrary, (a) each holder of a Claim shall be entitled to enforce his, her or its rights under the Plan, and (b) there is no injunction concerning claims against any of the current or former principals of the Debtor or against any non-debtor entity.

### C.    EXCULPATION AND LIMITATION OF LIABILITY.

1.      Neither the Debtor's Bankruptcy Estate, nor the Debtor, will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Plan, the Debtor's Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or as provided by the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

2.      No holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the Debtor's Bankruptcy Estate or the Debtor, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Plan, or the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except as provided by the Plan or by law.

# XIV.   DISCHARGE

This is a liquidating Plan, and the Debtor does not intend to engage in operations after Confirmation of the Plan.  Therefore, there shall be no discharge granted in this case.

# XV.   MISCELLANEOUS PROVISIONS

*Payment of Statutory Fees*.  All fees payable under 28 U.S.C. § 1930 shall be paid on or as soon after the Consummation Date as is practicable by the Debtor.

*Severability of Plan Provisions*. If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*Successors and Assigns.*  The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity,

*Consummation of Plan*. The Confirmation Order shall include (a) a finding by the Bankruptcy Court that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order; and (b) the Bankruptcy Court's authorization for the Debtor to consummate the Plan immediately after entry of the Confirmation Order.

*Governing Law.*  Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and (ii) corporate governance matters shall be governed by the laws of the state of incorporation, without giving effect to the principles of conflicts of law thereof.

# XVI. FEASIBILITY

The Plan is a liquidating plan, and the proceeds of the sale of the personalty and the Debtor's real property shall be distributed to satisfy the claims of creditors to the extent possible.

# XVII.  CONFIRMATION OF THE PLAN

## A.    VOTING PROCEDURES AND REQUIREMENTS.

The Debtor is providing copies of this Combined Disclosure Statement and Plan and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtor that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, holders of Claims in Class 15 and 16 are Impaired, and, therefore, are entitled to vote to accept or reject the Plan.  The following voting procedures (the "Voting Procedures") have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

Unless otherwise provided below, a claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a timely filed proof of claim has not been filed, the amount of such claim as set forth in the schedules of assets and liabilities, filed by the Debtor or (ii) the amount of such claim as set forth in a timely filed proof of claim.

If a claim is deemed allowed in accordance with the Plan, such claim will be allowed for voting purposes in the deemed allowed amount set forth in the Plan.

If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

Ballots that are otherwise validly executed but do not indicate either acceptance or rejection of the Plan will not be counted.

Only Ballots that are timely received with signatures will be counted.  Unsigned ballots will not be counted.

Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will be counted.

Ballots that are illegible, or contain insufficient information to permit the identification of the creditor, will not be counted.

If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same claim, such ballots shall not be counted.

Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Bankruptcy Court at the Confirmation Hearing.

**IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTOR SO DETERMINE OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO BANKRUPTCY RULE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 5:00 P.M., ON DECEMBER __, 2011 AT THE FOLLOWING ADDRESS:**

Leonard H. Simon, Esq.
PENDERGRAFT & SIMON, L.L.P.
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(832) 202-2810 (Telecopy)
Email:  lsimon@pendergraftsimon.com
ATTORNEY FOR DEBTOR

**BALLOTS WILL BE ACCEPTED BY REGULAR MAIL, FACSIMILE OR EMAIL**

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to Debtor's counsel at the above address by regular mail, facsimile or email.  Please follow the directions contained on the Ballot carefully.

The process of soliciting acceptance of the Plan must be fair and open without outside influence in the form of representations, inducements or duress of any kind.  To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined disclosure requirements and Voting Procedures, please contact counsel for the Debtor.

**B.    ACCEPTANCE.**

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions hereinafter discussed below.  Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are Unimpaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests of Impaired Classes.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance

by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Plan, are counted.

## C.    CONFIRMATION OF THE PLAN.

To confirm the Plan, § 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (i) that the Plan has classified Claims and Interests in a permissible manner; (ii) that the contents of the Plan complies with the technical requirements of the Bankruptcy Code; (iii) that the Debtor has proposed the Plan in good faith; and (iv) that the Debtor has made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan and the HDD Bankruptcy Case.  The Debtor believes that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the Cramdown provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes. Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted.  In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims were to accept the Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests before it can confirm the Plan.

## D.    THE BEST INTERESTS TEST.

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must independently determine, pursuant to § 1129(a)(7), that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan. This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtor under Chapter 7.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtor was liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's assets if the Case was converted to Chapter 7 liquidation and the Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value").   Debtor's Liquidation Analysis is attached hereto as **Exhibit "8"**.

It is apparent from the attached Liquidation Analysis that the Plan provides a better distribution to unsecured creditors as they would receive if this case had been commenced as, or if it was converted to, one under Chapter 7 of the Code.

# XVIII.    DISCLAIMERS

*The Debtor has No Duty to Update*. The statements contained in this Disclosure Statement and Plan  are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement and Plan  after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement and Plan unless otherwise ordered to do so by the Bankruptcy Court.

**Source** *of Information*.  Counsel for Debtor has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement and Plan.  Although counsel for the Debtor has performed certain limited due diligence in connection with preparing this Disclosure Statement and Plan, he has not verified independently the information contained herein.

*No Legal or Tax Advice Provided*.  The contents of this Disclosure Statement and Plan should not be construed as legal, business or tax advice.  Each creditor or holder of an Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement and Plan is not legal advice to you. This Disclosure Statement and Plan may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

*No Admission Made*.  Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtor) or be deemed evidence of the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Interests.

*No Regulatory Agency Approval*.  No governmental or other regulatory agency approvals have been obtained as of the date of the mailing of the Plan and Disclosure Statement and Plan. Please note, however, that such approvals are a condition to the Plan's Effective Date.

# XIX.    CONCLUSION AND RECOMMENDATION

The Debtor believes that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Debtor therefore urges you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be <u>received</u> by the Balloting Deadline.

## XX.        EXHIBITS TO PLAN AND DISCLOSURE STATEMENT

| EXHIBITS | DESCRIPTION |
|---|---|
| Exhibit "1". | Prepetition Employee Wage Claims |
| Exhibit "2". | October Monthly Operating Report |
| Exhibit "3". | Retained Claims |
| Exhibit "4". | Allowed Claims of Non-Insider Unsecured Creditors |
| Exhibit "5" | Order Approving (i) Redneck Letter of Intent and (ii) Bid Procedures |
| Exhibit "6" | Redneck Letter of Intent |
| Exhibit "7" | Bid Procedures |
| Exhibit "8" | Liquidation Schedule |

Dated November __, 2011.

*/s/ Leonard H. Simon*
Leonard H. Simon, Esq.
TBN: 18387400; SDOT: 8200
PENDERGRAFT & SIMON
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 737-8207 (Direct)
(832) 202-2810 (Direct Fax)
lsimon@pendergraftsimon.com
**ATTORNEY IN CHARGE FOR DEBTOR**



ITAFY SALES LLC
DAVE 813 STE 100
E, TX 77354-1814

# ae Journal by Check

03-Sep-2011 to 28-Sep-2011

| Employee | Date | Num | Period Start | Period End | Item Type | Pay Item | | | | | | AFLAC | Child Support | Garn Admin Fee | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Frizzell, Glenn E. | 9/16/2011 | 4382 | 9/20/2011 | 9/11/2011 | | 1,113.00 | 0.00 | -95.00 | -88.76 | -16.13 | 0.00 | 0.00 | 0.00 | 0.00 | 900.17 |
| DeLeon, Danny Joe | 9/16/2011 | 4380 | 9/20/2011 | 9/11/2011 | | 1,350.00 | 0.00 | -33.00 | -58.12 | -16.90 | 0.00 | -38.12 | -34.82 | 0.00 | 1,034.10 |
| Jones, Tracy D. | 9/16/2011 | 4348 | 9/20/2011 | 9/11/2011 | | 1,346.18 | 0.00 | -175.00 | -48.83 | -16.63 | 0.00 | 0.00 | -41.48 | 0.00 | 1,036.12 |
| Williams, Bobie L. | 9/16/2011 | 4382 | 9/20/2011 | 9/11/2011 | | 2,367.86 | 0.00 | -484.00 | -48.77 | -33.00 | 0.00 | 0.00 | -27.40 | 0.00 | 1,743.38 |
| Burgos, Russell R. | 9/16/2011 | 4344 | 9/20/2011 | 9/11/2011 | | 1,811.16 | -60.00 | -136.00 | -52.56 | -31.77 | 0.00 | 0.00 | -16.98 | -639.23 | -9.45 |
| | 9/22/2011 | 1919 | 4/1/2011 | 9/20/2011 | | 6,000.00 | 0.00 | -640.00 | -219.00 | -72.00 | 0.00 | 0.00 | 0.00 | -230.31 | 4,814.19 |
| Ott, Billy Joe | 9/16/2011 | 4375 | 9/20/2011 | 9/11/2011 | | 1,022.30 | 0.00 | -104.00 | -42.35 | -14.80 | 0.00 | 0.00 | -16.29 | 0.00 | 845.21 |
| DeVall, Eric C. | 9/16/2011 | 4381 | 9/20/2011 | 9/11/2011 | | 1,613.36 | 0.00 | -171.00 | -96.44 | -32.53 | -374.80 | 0.00 | -33.04 | 0.00 | 1,321.45 |
| Nank, Gary L. | 9/16/2011 | 4352 | 9/20/2011 | 9/11/2011 | | 4,087.88 | 0.00 | -721.00 | -196.82 | -68.44 | 0.00 | 0.00 | -73.86 | 0.00 | 3,716.43 |
| Williams, Barry J. | 9/16/2011 | 4353 | 9/20/2011 | 9/11/2011 | | 1,218.00 | 0.00 | -164.00 | -51.07 | -17.63 | 0.00 | 0.00 | 0.00 | 0.00 | 903.30 |
| Powell, Steven B. | 9/16/2011 | 4378 | 9/20/2011 | 9/11/2011 | | 4,967.88 | 0.00 | -428.00 | -291.82 | -68.72 | 0.00 | 0.00 | -36.95 | 0.00 | 3,708.95 |
| Cessne, Joseph A. | 9/16/2011 | 4386 | 9/20/2011 | 9/11/2011 | | 2,300.00 | 0.00 | -365.00 | -168.00 | -38.25 | -374.80 | 0.00 | 0.00 | 0.00 | 1,521.75 |
| Labonte, Jack M. | 9/16/2011 | 4387 | 9/20/2011 | 9/11/2011 | | 1,687.88 | -60.00 | -88.00 | -42.50 | -14.71 | 0.00 | 0.00 | -23.22 | 0.00 | 971.07 |
| McRight, Larry C. | 9/16/2011 | 4370 | 9/20/2011 | 9/11/2011 | | 2,262.31 | 0.00 | -391.00 | -33.13 | -30.13 | 0.00 | 0.00 | 0.00 | 0.00 | 1,990.17 |
| Hudson, Jr., James C. | 9/16/2011 | 4384 | 9/20/2011 | 9/11/2011 | | 994.68 | 0.00 | -69.00 | -38.28 | -13.60 | 0.00 | 0.00 | -36.90 | 0.00 | 912.20 |
| Ohley, Jonathan A. | 9/16/2011 | 4387 | 9/20/2011 | 9/11/2011 | | 4,416.38 | 0.00 | -664.00 | -193.94 | -88.92 | 0.00 | 0.00 | 0.00 | 0.00 | 3,370.62 |
| Jaffe, Steve J. | 9/16/2011 | 4366 | 9/20/2011 | 9/11/2011 | | 2,307.88 | 0.00 | -256.00 | -82.88 | -32.68 | 0.00 | 0.00 | -47.08 | 0.00 | 1,900.70 |
| Robertson, Michael W. | 9/16/2011 | 4380 | 9/20/2011 | 9/11/2011 | | 1,902.00 | 0.00 | -44.00 | -46.66 | -32.91 | 0.00 | 0.00 | -43.86 | 0.00 | 1,427.23 |
| men, Rex W. | 9/16/2011 | 4384 | 9/20/2011 | 9/11/2011 | | 4,667.88 | 0.00 | -636.00 | -361.92 | -98.72 | -200.00 | -360.00 | 0.00 | 0.00 | 3,500.00 |
| Umble, Duane J | 9/16/2011 | 4381 | 9/20/2011 | 9/11/2011 | | 8,766.32 | 0.00 | 0.00 | -242.31 | -42.86 | 0.00 | 0.00 | 0.00 | 0.00 | 5,443.36 |
| Achevo (Engineer), Cem | 9/16/2011 | 4378 | 9/20/2011 | 9/11/2011 | | 3,646.16 | 0.00 | -728.00 | -191.54 | -68.77 | 0.00 | -286.22 | 0.00 | 0.00 | 2,630.81 |
| ton, April L. | 9/16/2011 | 4353 | 9/20/2011 | 9/11/2011 | | 1,364.62 | 0.00 | -116.00 | -27.60 | -16.86 | 0.00 | 0.00 | -13.29 | 0.00 | 1,178.92 |
| Wyatt, Donald A. | 9/16/2011 | 4364 | 9/20/2011 | 9/11/2011 | | 1,027.00 | 0.00 | -43.13 | -43.13 | -14.90 | 0.00 | 0.00 | 0.00 | 0.00 | 842.96 |
| Phelps, Scott Travis | 9/16/2011 | 4377 | 9/20/2011 | 9/11/2011 | | 1,186.00 | 0.00 | -46.00 | -48.95 | -17.23 | 0.00 | 0.00 | 0.00 | 0.00 | 1,014.90 |

YMY SALES LLC
JANIE ST STE 100
TX 77541-1814

03-Sep-2011 to 29-Sep-2011

## ...ee Journal by Check

| Employee | Date | Name | Period Start | Period End | Item Type | Pay Item | | | | Advance | AFLAC | Child Support | Garn Admin Fee | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Martin, David Mote | 9/10/2011 | 4348 | 9/29/2011 | 9/11/2011 | | 2,338.77 | 0.00 | -326.00 | -83.98 | -33.34 | 0.00 | 0.00 | 0.00 | 1,895.74 |
| Nojica, Benito V | 9/10/2011 | 4372 | 4/29/2011 | 9/11/2011 | | 3,461.54 | 0.00 | -425.00 | -148.36 | -36.30 | 0.00 | 0.00 | 0.00 | 2,545.95 |
| | 9/10/2011 | 4382 | 9/15/2011 | 9/26/2011 | | 345.16 | 0.00 | 0.00 | -16.84 | -4.82 | 0.00 | 0.00 | 0.00 | 326.50 |
| Reynolds, Deanzie C | 9/10/2011 | 4379 | 9/29/2011 | 9/11/2011 | | 2,674.92 | 0.00 | -266.00 | -108.23 | -37.34 | 0.00 | 0.00 | 0.00 | 2,123.33 |
| Duerzal, Brandon L | 9/10/2011 | 4388 | 9/29/2011 | 9/11/2011 | | 768.00 | 0.00 | -78.00 | -29.73 | -10.27 | 0.00 | 0.00 | 0.00 | 590.00 |
| Miller, Jeffrey G | 9/10/2011 | 4371 | 9/29/2011 | 9/11/2011 | | 2,074.92 | 0.00 | -314.00 | 47.28 | -36.11 | 0.00 | 0.00 | 0.00 | 1,643.50 |
| Santos, Daniel L | 9/10/2011 | 4382 | 9/29/2011 | 9/11/2011 | | 738.50 | 0.00 | -69.00 | -39.86 | -15.96 | 0.00 | 0.00 | 0.00 | 636.34 |
| Orte, Aaron H | 9/10/2011 | 4373 | 9/29/2011 | 9/11/2011 | | 846.76 | 0.00 | -36.00 | -38.84 | -11.41 | 0.00 | 0.00 | 0.00 | 771.43 |
| Orte, Juan C | 9/10/2011 | 4374 | 9/29/2011 | 9/10/2011 | | 1,678.36 | 0.00 | -112.00 | -43.86 | -28.68 | 0.00 | 0.00 | -4.83 | 1,449.86 |
| Turk, Chad H | 9/10/2011 | 4386 | 9/29/2011 | 9/10/2011 | | 2,000.00 | 0.00 | -206.00 | -42.88 | -38.37 | 0.00 | 0.00 | -173.68 | 1,338.07 |
| Swinson, Robert D | 9/10/2011 | 4361 | 9/29/2011 | 9/11/2011 | | 602.00 | 0.00 | -26.00 | -32.51 | -11.16 | 0.00 | -32.74 | 0.00 | 668.74 |

Total:   $62,419.33



# EXHIBIT "2"

DEBTOR'S EXHIBIT "2"
TO BE FILED SEPARATELY BEFORE 11/11/2011

# EXHIBIT "3"

DEBTOR'S EXHIBIT "3"
TO BE FILED SEPARATELY BEFORE 11/11/2011

# EXHIBIT "4"

DEBTOR'S EXHIBIT "4"
TO BE FILED SEPARATELY BEFORE 11/11/2011





**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/27/2011

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HDD Rotary Sales, LLC,** | § | **Case No. 11-38053** |
| | § | **(Chapter 11)** |
| Debtor | § | |

**ORDER APPROVING
(I) REDNECK LETTER OF INTENT AND (II) BID PROCEDURES**

On September 29, 2011, the Debtor filed its Expedited Second Motion to Approve (i) Letter of Intent and Purchaser Protection Provisions, (ii) Sale Procedure and Form of Notice, and (iii) Certain Bid Protections (the "Motion"). ECF Document 27. On September 30, 2011, the Court set the Motion for hearing on October 6, 2011, at 1:30 p.m. On October 6, 2011, the Debtor filed an Amended Expedited Second Motion to Approve (i) Letter of Intent and Purchaser Protection Provisions, (ii) Sale Procedure and Form of Notice, and (iii) Certain Bid Protections (the "Amended Motion"). ECF Document 45. The Court set the Amended Motion for hearing on October 6, 2011, at 1:30 p.m., and the Debtor sought approval of an LOI with Axon (as hereinafter defined). At the hearing two parties, Axon Tubular Products, Inc. and/or its assignee ("Axon") and Redneck Pipe Rental's Inc. ("Redneck"), expressed interest in entering into a Letter of Intent with the Debtor that called for a sale of substantially all of the Debtor's assets, excluding cash, accounts receivable, notes receivable, prepaid assets and all or most claims under Chapter 5 of the Bankruptcy Code through a public auction. Both before and at the hearing, Axon and Redneck engaged in a bidding contest. Comparing the Motion to the Amended Motion, it appears that over a period of six days, Axon and Redneck had engaged in bidding and counter-bidding that resulted in the Redneck offer increasing to $4,600,000, and Axon's offer increasing from $3,600,000 to $4,800,000. As of the filing of the Amended Motion, both the Axon and Redneck offers called for (a) certain buyer protection features, to wit: a "break up fee" or a "termination fee" equal to 5% of the purchase price, (b) DIP lending facilities in the amount of $400,000, with interest at 5% per annum. At or immediately before the hearing, Redneck made one final offer, raising its offered purchase price to $5,200,000, and Axon raised its offered cash purchase price to $5,000,000 plus other consideration. During the hearing, Redneck made one final modification to its offer: it agreed to become the "Stalking Horse" bidder for a purchase price of $5,200,000, and agreed to waive the requirement for buyer protection provisions. The Court was not persuaded that the Axon Offer was the higher and better offer; therefore, the Court expressed the view that the Debtor should accept the Redneck offer.

Subsequently, Redneck followed through on its offer to become the DIP lender to the Debtor, and, pursuant to an Order Authorizing Post-Petition Secured Financing entered on October 7, 1011. ECF Document No. 54, the Court approved a DIP loan of up to $400,000 to the Debtor by Redneck at 5% interest per annum (the "DIP Order").

To the extent that any provisions in the DIP Order conflict with the DIP financing provisions set forth in Paragraph 6 of Redneck's Letter of Intent of October 10, 2011, the DIP Order controls and/or supersedes those provisions.

Meanwhile, the United States Trustee ("UST") appointed a Committee of Unsecured Creditors (the "Committee") on October 5, 2011. ECF Document 46. The Committee met and appointed counsel on October 11, 2011, and counsel for the Committee appeared at a status conference held on October 11, 2011, at 3:00 p.m. The Court slowed the process to give counsel for the Committee time to familiarize himself with the case.

The Court set a hearing for October 21, 2011, at 11:00 a.m. to consider approval of Redneck's Letter of Intent and the Bid Procedures that had been submitted with the Amended Motion. Having considered the proposed Letter of Intent with Redneck, a true and correct copy of which is attached to this order as **Exhibit "1"** (the "Redneck LOI"), and the proposed Bidding Procedures, as revised, a true and correct copy of which is attached to this order as **Exhibit "2"**, and after appropriate and sufficient notice and opportunity for a hearing, and upon consideration of the arguments of counsel, and the entire record in the case, the Court finds that there is a market for the assets of the Debtor, and concludes that it is in the best interests of the Debtor's estate and its creditors to adopt rules for proceeding in an expeditious fashion with a sale of the assets, to approve the Redneck LOI and to approve the Bid Procedures. Accordingly, it is

**ORDERED** that the Redneck LOI is hereby approved, and the Debtor is authorized to enter into the LOI, which shall be binding on the Debtor in accordance with its terms. It is further

**ORDERED** that the Bid Procedures attached as Exhibit "2" are approved.

**ORDERED** that the Debtor and Redneck shall enter into an Asset Purchase Agreement consistent with the LOI (the "APA") and file same by ECF with the Clerk of Court within (15) fifteen days from entry of this Order, and the APA and transactions contemplated therein shall remain subject to review and approval of this Court.

ORDERED that this order does not approve a sale under § 363 or otherwise, with such approval only to occur after notice and hearing.

ORDERED that the Debtor will owe no damages to Redneck if the Debtor prosecutes a motion (and/or plan) proposing to sell in accordance with the LOI and the Court denies the requested relief, but Redneck will be entitled to a refund of its deposit if the Court denies the requested relief.

ORDERED that any party-in-interest may object at a § 363 hearing that the proposed sale is a sub rosa plan or should otherwise be rejected and the Court will consider the merits of those arguments at the hearing on the § 363 motion.

SIGNED this 27th day of October 2011.

**HONORABLE MARVIN ISGUR,**
**CHIEF US BANKRUPTCY JUDGE**

# EXHIBIT "6"

Exhibit "1"

## TERM SHEET

Subject to the preparation and approval of mutually acceptable and customary documentation, and subject to approval by the Bankruptcy Court, the following are the basic terms and conditions upon which Redneck Pipe Rentals, Inc. ("Redneck" or "Purchaser") is willing to purchase from HDD Rotary Sales, LLC and HDD Rotary, LLC (collectively, "Debtor" or "Seller"), substantially all of the assets owned, leased or otherwise utilized by and in the Seller's business.  Such assets are more particularly described in Section 2 below:

1) **Purchase Price** – The purchase price for the Assets (the "Purchase Price") shall be Redneck's payment to the Seller of Five Million Two Hundred Thousand and No/100 ($5,200,000.00) CASH on the Closing Date.

   a) Redneck shall remit to Seller's counsel an earnest money deposit of $230,000.00 within three (3) days after entry of the Interim Sale Order (defined below).

2) **Assets** – Seller will sell to Redneck and Redneck will purchase from Seller all of the assets owned, leased, or otherwise utilized by Seller in the Business (the "Assets"), including without limitation but specifically excluding all of Seller's cash, accounts and notes receivable and pre-paid assets), the following:

   a) All of the fixed assets (including all machinery, trade fixtures, piping equipment, vehicles, furniture, fixtures, supplies and materials) owned or otherwise utilized by Seller, including, but not limited to, those fixed assets, machinery, equipment and fixtures;

   b) All raw materials, work in process, pipe, tubular products, and inventories belonging to Seller, whether on hand or on hand or on order and whether located on Seller's Premises or otherwise;

   c) All security deposits and all potential claims and/or reimbursement rights of Seller against other in connection with, or related to, Seller's Business;

   d) All customer lists of Seller;

   e) All rights possessed or utilized by Seller with respect to all computer hardware and computer software owned, leased, licensed or otherwise utilized by Seller.

   f) All rights possessed or utilized by Seller with respect to all existing or pending trade names, trade marks, service marks, copyrights, patents, patents pending, patent

7572875v 12

applications and other intellectual property and all marketing literature and other
materials owned, licensed, or otherwise utilized by Seller;

g) All existing books and records of Seller through the Closing, including, without
limitation, all of Seller's customer lists;

h) All licenses, intellectual property, patents, patents pending, patent applications, permits,
franchise grants, easements, ordinances and certifications owned and/or held by Seller
and its affiliates, including, without limitation, the assets described on Debtor's Schedule
B (Paragraph 22), the patent application for the PTECH+ premium connector and
improved threaded tool joint and any designs for a casing connector or similar tool;

i) An common law, state or federal trademark rights to names, logos or marks, including,
without limitation, PTECH+;

j) Seller's interest in any rental agreements or leases for equipment, including any interest
in the equipment covered there under, which may be assumed and assigned to Redneck,
in Redneck's sole discretion.

k) Seller's computers, office equipment, computer programs, plans, drawings, budgets,
software, etc;

l) All web sites, URL's and domain names;

m) All general intangibles of Seller;

n) All other property of Seller's business, wherever located;

o) All insurance policies providing coverage to Seller or its employees, managers and
members for casualty and liability, health, worker's compensation, casualty and liability;

p) All pending contracts, or such portion thereof, designated by Redneck (the "Assumed
Contracts"); and

q) All real property and improvements thereon owned by Seller, including the real property
located at 13019 Crockett Martin Road, Conroe, Texas 77306 ("Seller's Facility");

r) All rights of Seller provided by the Settlement Agreement with Grant Prideco, L.P;

s) All causes of action (including, without limitation, causes of action arising in/under
Chapter 5 of the Bankruptcy Code) regarding the enforceability/avoidability of any
license agreements related to any of Debtor's intellectual property (including, without
limitation, the assets described on Debtor's Schedule B (Paragraph 22), the patent
application for the PTECH+ premium connector and improved threaded tool joint and
any designs for a casing connector or similar tool).

7572875v 12

Case 11-38053   Document 137   Filed in TXSB on 11/08/11   Page 77 of 83

Case 11-38053   Document 110   Filed in TXSB on 10/27/11   Page 5 of 8
Case 11-38053     Document 107-1     Filed in TXSB on 10/27/2011     Page 4 of 4

3) <u>Bidding Procedures</u> – The bidder deposit shall be no less than the Purchaser Deposit ($230,000.00). The bidding increment for the initial overbid shall be $250,000.00, and thereafter $100,000.00 for subsequent bids. For purposes of any auction, Redneck shall automatically be deemed a qualified bidder.

4) <u>Disinterested Fiduciary</u> – A Disinterested Fiduciary, such as a Chapter 11 Trustee or otherwise, shall conduct the Sale Auction.

5) <u>Release</u> – As a condition to closing, Debtor will execute and deliver to Redneck a "Purchaser Release." The Purchaser Release shall release Redneck from any and all claims that the Debtor may have now, or in the future, against Redneck.

6) <u>Financing</u> – To facilitate the proposed sale, Redneck is willing to loan the Debtor up to $400,000.00, at an interest rate of 5% (the "Loan"). In exchange for the Loan, the Debtor shall grant to Redneck a security interest and lien upon all of the Debtor's (and its estate's) real and personal property assets, whether now owned or existing or hereafter created, acquired or arising, subordinate only to existing, valid, perfected and unavoidable security interests and liens. The security interests and liens granted to Redneck shall exclude chapter 5 causes of action. The Loan shall be due and payable to Redneck the earlier of (a) March 6, 2012, and (b) the closing of a sale of any assets of the Debtor's estate that includes any of the Debtor's intellectual property.

7) <u>Usual and Customary Documents</u> – Should this Term Sheet be approved by the Bankruptcy Court, the terms herein shall be incorporated into the usual and customary purchase/sale documents.

By: _____

L. Murray Dallas, President

Redneck Pipe Rentals, Inc.

7572875v.12



**EXHIBIT "2"**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **HDD ROTARY SALES, LLC** | § | **Case No. 11-38053** |
| **DEBTOR.** | § | **Chapter 11** |
| | § | |
| | § | |

**BID PROCEDURES**

**TO ALL PARTIES WISHING TO MAKE A QUALIFIED BID FOR THE ASSETS OF THE CAPTIONED DEBTOR:**

1.     The Debtor has received a Letter of Intent or Term Sheet Agreement (the "LOI") with Redneck Pipe Rental's Inc. ("Redneck") (the "Lead Bidder") for the sale of substantially all of the Debtor's assets, excluding cash, accounts receivable, notes receivable, prepaid assets and claims under Chapter 5 of the Bankruptcy Code, except for any Chapter 5 claims related to the license agreement that Axon Downhole Tools, Inc. obtained from the Debtor and/or the Manufacturing Agreement obtained by Superior Drillpipe Manufacturing, Inc. from the Debtor (collectively, the "Assets" or "Purchased Assets"). All initially capitalized terms used herein shall have the same meaning assigned in the LOI. The LOI contemplates that the Debtor and Lead Bidder will enter into an asset purchase agreement (the "APA"). These Bid Procedures shall govern the mode of conducting a sale of the Debtor's assets. The sale shall occur by Court Order pursuant to a duly filed Motion for Sale under 11 U.S.C. § 363 (the "Sale Motion") and/or confirmation of a plan of reorganization (the "Plan"). Pursuant to the Order approving the LOI and these Bid Procedures (the "Order"), the Debtor shall file the signed APA with the Court and make it available for review by creditors, bidders and parties in interest in accordance with the deadlines set in the Order. The LOI, and the procedures set forth below, have been approved by the Court acting in the Debtor's chapter 11 case (the "Court").

2.     Debtor, the Lead Bidder, and Official Creditors' Committee (the "Committee") shall conclude negotiations on, and finalize, a form of APA within 15 days of entry of the Court Order approving these Bid Procedures. That form of APA shall be filed by the Debtor via a Notice to the Court and, thereby, made available to all interested parties. Unless an objection to the form of the APA is filed by a party-in-interest within three (3) business days after submission, (as determined by reference to the ECF filing information sheet) all objections to the form of the APA will be deemed waived; however, notwithstanding the foregoing, a prospective bidder is allowed to submit its own form of asset purchase agreement black-lined against the APA. The form of APA submitted shall be deemed reasonable unless the Court finds that any material term(s) of the agreement create an unfair bidding advantage for the Lead Bidder, are

1 | P a g e

manifestly unjust, or are such that the Court could not enter a sale Order under the standards of 11 U.S.C. § 363 for a sale of Debtor's Assets not in the ordinary course of business over the objection of creditors and stakeholders.

3.      Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must, on or before 5:00 p.m. Central Time on December 8, 2011, (i) execute and deliver to Debtor's counsel, Pendergraft & Simon, LLC, 2777 Allen Parkway, Suite 800, Houston, Texas 77019, Direct Line: (713) 737-8207, Direct Fax: (832) 202-2810, Email: lsimon@pendergraftsimon.com, a reasonable confidentiality agreement prepared by the Debtor, unless the bidder has already entered into a confidentiality agreement with the Debtor; (ii) deposit with the Debtor's counsel the sum of $230,000.00 (each, the "Alternative Buyer's Deposit") which deposit shall be nonrefundable unless such Qualified Bidder is not the highest and best offer as determined by the Court, and shall be held in escrow, without interest, pending completion of the bid process; (iii) submit to Debtor's counsel an unqualified and binding cash bid totaling at least $5,450,000, along with an executed written binding agreement, black-lined against the APA executed by the Lead Bidder and the Debtor. Such bid shall not contain an inspection period nor be subject to any due diligence review, financing or other conditions/contingencies ("Qualified Bids"); and (iv) provide financial and other reasonable information as may be requested to the Debtor's counsel, that allows the Debtor, through its Chief Restructuring Officer, Wayne Fuquay (the "CRO"), and the Committee to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein. The Lead Bidder is and shall be deemed to be, a Qualified Bidder, and does not need to take any further action to become a Qualified Bidder. If no other Qualified Bidders are identified, the LOI and the to-be-executed APA between the Debtor and Redneck shall be deemed the Highest and Best Bid (as defined below). No letter of intent or other written proposal submitted to the Debtor prior to the filing of these Bid Procedures by any party other than Redneck shall constitute or be considered a Qualified Bid for purposes of these Bid Procedures, unless it otherwise meets the requirements of a Qualified Bid under these Bid Procedures.    Redneck and each other Qualified Bidder shall be provided with copies of all non-attorney client, non-work product privileged documents concerning the subject of the Debtor's patent application.

4.      Debtor's counsel shall promptly provide to all prospective purchasers due diligence materials that will be selected by the Debtor and the Committee, and such other reasonable due diligence materials that a prospective purchaser may request, provided such prospective purchaser executes a reasonable confidentiality agreement. Prospective purchasers may inspect the premises of the Debtor at a time that is set by the CRO.

5.      On or before 5:00 p.m. Central Time on December 9, 2011, the Debtor shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received. This Notice shall also identify all Bidders who Debtor deemed to have submitted non-conforming bids or conforming bids submitted by non-qualified bidders. The Debtor shall
serve a copy of the notice and the corresponding bids on the Committee and all Qualified Bidders by electronic mail. Unless a party-in-interest files an objection with the Court before the close of business on the next day that the Court is open, all objections to the exclusion of bidders under these procedures shall be deemed waived and the bid process may continue without participation of the excluded bidders. On or before 5:00 p.m. Central Time on November 8,

Case 11-38053   Document 137   Filed in TXSB on 11/08/11   Page 81 of 83

Case 11-38053   Document 110   Filed in TXSB on 10/27/11   Page 8 of 8
Case 11-38053   Document 108   Filed in TXSB on 10/27/2011   Page 3 of 3

2011, Debtor shall file a Sale Motion and/or a Plan providing for a sale of the Debtor's Assets, and shall use its best efforts to obtain approval of the sale as soon as possible.

      6.    If two or more timely Qualified Bids (including the Lead Bidder's bid) are received, an auction for the Purchased Assets will be conducted in Courtroom 404, The Bob Casey Federal Courthouse, 515 Rusk Street, Houston, Texas,  on **December 13, 2011, commencing at 9:30 O'Clock a.m. Central Standard Time.**  Bankruptcy Judge David R. Jones,  shall conduct the auction, or, at the Bankruptcy Court's order,
designate another person to conduct the auction.  The auction shall be recorded via the Court's audio recording system.  Only Qualified Bidders may participate in the auction.  All Qualified Bidders, or their authorized representatives, must be physically present at the auction.  At the commencement of the auction, the person conduction the auction shall announce the lead bid as of that time, and then open up to the floor to live bidding by Qualified Bidders.  Minimum bid increments shall be $100,000.  The person conducting the auction shall announce the highest bid thrice before striking off  to announce a winning Bid.

      7.    At the conclusion of the auction, whoever conducted the auction will announce the highest and best Qualified Bid (the "Designated Highest and Best Bid") and the next highest and best Qualified Bid (the "Back-Up Bid").  The Debtor (acting through the CRO) will seek approval of the Designated Highest and Best Bid at the final hearing on the Sale Motion and/or Plan confirmation hearing (as approved by the Court at the final sale hearing or Plan confirmation hearing the "Confirmed Highest and Best Bid").  If, for any reason, the Qualified Bidder submitting the Confirmed Highest and Best Bid fails to timely consummate the purchase of the Purchased Assets, the Debtor (acting through the CRO) may seek to consummate a sale based on the Back-Up Bid without further approval by the Court unless the Bidder submitting the Back-Up Bid requests a "comfort order" be obtained.  The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Purchased Assets shall remain open and in full force until the close of a sale of the Purchased Assets to the party making the Confirmed Highest and Best Bid or the party making the Back-Up Bid.

      8.    Within two business days after the conclusion of the auction described above, Debtor's counsel shall return by check or wire transfer the full amount of the Alternative Buyer's Deposit submitted by each party that is not selected as submitting the Confirmed Highest and Best Bid or the Back-Up Bid, and shall return the Purchaser's Deposit (as defined in the LOI) if Redneck is not the Confirmed Highest and Best Bid or the Back-Up Bid.  If the sale of the Purchased Assets is consummated to the party submitting the Confirmed Highest and Best Bid, or is otherwise not consummated with the party submitting the Confirmed Highest and Best Bid within thirty (30) days after the conclusion of the auction, the Alternative Buyer's Deposit of the party that is declared to have submitted the Back-Up Bid (or Purchaser's Deposit (as defined in the LOI), if applicable) shall be returned by check or wire transfer within two business days thereafter, unless the Alternative Buyer is required to close the sale as the Back-Up Bid.  In the event that any party that is required to close under these procedures fails to do so, that party's deposit is forfeited (with the provision that the forfeited deposit is not a limitation on damages).



DEBTOR'S EXHIBIT "8"
TO BE FILED SEPARATELY BEFORE 11/11/2011